SAMUEL F. CONNER, Caveator, Appellant, *v.* BENJAMIN N. BROWN, Executor of the last will and testament of Maria C. Loney, Deceased, Appellee.

(*December* 15, 1938.)

LAYTON, C. J., RODNEY and SPEAKMAN, J. J., sitting.

*William W. Knowles* for appellant.

*John J. Morris, Jr.,* for appellee.

Superior Court for New Castle County, No. 167, May Term, 1938.

538

542

LAYTON, C. J., delivering the opinion of the Court:

■■■ With respect to the degree of influence exercised over a testator sufficient to vitiate his will, no distinct rule can be laid down which will be applicable to all cases. Undue influence, as the adjective suggests, is an excessive or inordinate influence considering the circumstances of the particular case; and the general rule is that the degree of influence to be exerted over the mind of the testator, in order to be regarded as undue, must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to impel him to make a will that speaks the mind of another and not his own. It is immaterial how this is done, whether by solicitation, importunity, flattery, putting in fear, or in some other manner; but whatever the means employed, the undue influence must have been in operation upon the mind of the deceased at the time of the execution of the will. The essentials of undue influence are a susceptible testator, opportunity to exert influence, a disposition so to do for an improper pur-

pose, the actual exertion of such influence, and the result demonstrating its effect.

Where a will is sought to be set aside on the ground of undue influence alone, testamentary capacity is conclusively presumed; but as it is well known that the strength and vigor of the will and the condition of the mental powers are largely dependent upon the physical condition of the individual, which may become weakened by old age or illness, the physical and mental condition of the testator is a proper subject of inquiry to determine his susceptibility to influence. The existence of opportunity arising from the fact that the testator and the person charged lived alone together in the same house, is a fact to be considered, as is also the existence of a confidential relationship between them. Likewise, activity on the part of the person charged in procuring or superintending the making of the will, and its unreasonableness or unnaturalness, are matters material to the issue.

But, as the execution of a will by a testator who is admitted to have testamentary capacity is presumed to be wholly free and voluntary like every human act until the contrary is proved either expressly or impliedly, the burden of proving undue influence at the time of the execution of the will, and that the will was the result of it, lies upon the contestant. So, the fact that the proponent of a will had an opportunity, at the date of its execution, to exercise undue influence, raises no presumption that he did so; nor does the mere existence of confidential relations between the testator and beneficiary; nor the alteration of an existing will arbitrarily and without reason; nor the mere fact that a testator disposes of his property unequally, or in a manner which may seem unreasonable; for a testator having capacity, and acting freely, may dispose of his property as he sees fit.

Further it may be said that a will which is solely the outcome of kindness, induced by acts of attention or service to a testator in caring for him, even where such acts are actuated by a selfish motive, is not a will procured by undue influence; nor will the employment of flattery, appeals to the affection or pity of the testator, or persuasion or importunity falling short of coercion, constitute undue influence.

Such circumstances, singly or in conjunction with others, may arouse suspicion and to such degree as to require the vigilant scrutiny of the Court, and to require, in a proper case, the proponent to submit the clearest evidence extending far beyond the mere proof of execution by the testator and his knowledge of the contents of the will.

These well understood principles are to be applied to the will of the testatrix.

She was a woman of advanced years. She executed a series of wills within less than a year materially altering her prior dispositions of her property, always to the increasing advantage of the beneficiary, Mrs. Schilling. During the progress of her testamentary dispositions, her church, the charitable organizations and her nearest relatives were completely ignored, and Mrs. Schilling was given the entire estate with the exception of two hundred dollars which was left to one of her third cousins. The testatrix and the beneficiary lived together alone, or practically so, and a confidential relationship between the two may be said to have existed.

These are admitted facts and circumstances; but the most material subjects of inquiry are with respect to the physical and mental condition of the testatrix and the actual exercise of undue influence by the beneficiary. This requires a brief review of the evidence.

If the testimony of the first attorney of the testatrix and the natural inferences to be drawn therefrom, are to

be given face value, the testatrix was imbecile almost to the point of mental incapacity, and, in addition, was in fear of the beneficiary, and greatly under her influence. But, this testimony, considered by itself is open to the gravest criticism and disparagement; it is substantially shaken by its own inconsistencies and the astounding attitude of the person giving it, and when compared with the volume of disinterested evidence, its probative value melts away. He was careful to provide in all of the wills prepared by him what, in effect, was a legacy of $500.00 to himself. He was careful, on each of the several occasions, to take with him as witnesses to the wills and the codicil two acquaintances of his, who were not known to the testatrix, although there were neighbors and friends of the testatrix available for such service. He suggested in the presence of the young lady, one of the witnesses brought by him, that the testatrix give a legacy to her. He intimated that it would be wise for the testatrix to remove her money from the Savings Fund Society and invest it in real estate mortgages. He borrowed money from her and failed to pay it in full. By his own sworn testimony, on at least three occasions when he and the attesting witnesses were alone with the testatrix, he remonstrated with her and upbraided her for altering the dispositions of her own property, using, as is apparent from the record, every species of argument, as well as persuasion, appeals to sympathy and downright denunciation, to an old woman, senile and bereft of independent mind and will, with no effect whatever. This is a contradiction, startling enough; but, in addition, the witness presents the extraordinary spectacle of a lawyer preparing, and demanding and receiving his fees for preparing, and supervising the solemn execution of a succession of wills for a senile, doddering woman, without a vestige of discretionary mind, always insisting upon and safeguarding his fee as executor which was to be paid to him upon the

issuance of letters testamentary, and all the while with the secret purpose and intention of attacking the validity of the wills that did not have his approval. This, to employ an understatement, is a most unpleasant picture.

The testimony of the two attesting witnesses to the wills prepared by the attorney may be dismissed with the comment that it constituted, palpably, a mere faint echo.

The evidence of Miss Coyle, a third cousin of the testatrix, whose initial benefit of a one-third share of the money in bank was reduced to a small legacy of two hundred dollars, was most general, to the effect that the testatrix was weakening and wasting away, lacked memory and repeated herself in her conversations. She gave no evidence whatever tending to support the charge·of undue influence exerted by Mrs. Schilling, but, on the contrary, was heard to say to her at the funeral of the testatrix, and it was not denied, that she, Mrs. Schilling, had been as good as a daughter to the testatrix.

The testimony adduced by the proponent of the will was in sharp contrast. It came from the lips of an array of witnesses wholly disinterested, including her physician, a minister of the Gospel, friends, neighbors and former pupils, who talked at length with the testatrix frequently and privately. Without exception they characterized her as a woman of exceptionally keen intelligence and of strong and independent mind and will, appreciative of kindness and resentful of neglect, interested in her neighbors and friends, in her former pupils and in young people in general, attractive to them because of her intelligent interest in them. Their testimony proves conclusively that there was an uncommon bond of affection between the testatrix and her beneficiary, born, no doubt, of the initial kindness of the latter, and increased and strengthened by the unfailing care and attention lavished upon her. The suggestion

that the testatrix was in fear of Mrs. Schilling was utterly repelled.

It was admitted that Mrs. Schilling never was present when the wills were made at the home of the testatrix; and from the evidence it appears clearly that the testatrix saw whom she was pleased to see and at any time and in private.

In the circumstances shown, the will of the testatrix was neither unnatural nor unreasonable. Her closest relatives were the caveator who, living in Florida, saw her seldom, and Mrs. Coyle who, ill and older than herself, might, very probably, die first. Miss Coyle held a secretarial position, and being occupied with her work and with the care of her mother, was not able to see much of the testatrix, or to attend to her wants and needs. The relations between the testatrix and her relatives were, no doubt, of a friendly character; but it is quite evident that they did not bulk too largely in the testatrix's mind, for, even in the first will, admitted by the contestant to express the real mind of the testatrix, the larger part of the estate was given to a church and other charitable organizations. So far as the church is concerned, the testimony of a totally disinterested witness disclosed that the testatrix entertained a feeling of resentment for its neglect of her, a pew holder and contributor; and with respect to the other charitable organizations there is no evidence that the testatrix had ever been particularly interested in them.

Much importance was attached to the statements alleged to have been made by the testatrix when asked by her first attorney to go with him to vote at the municipal election on June 2, 1937. It was argued to a tiresome extent that the declaration by the testatrix that Mrs. Schilling had told her not to dare to go out to vote with anyone but herself, was strong evidence that the testatrix was under her dominion. The evidence, while admissible, was not of strong character; and with respect to these supposed state-

ments of the testatrix and to other statements alleged to have been made by her upon the several occasions of the executions of the wills, it is to be said that verbal admissions and statements, testified to after a length of time, should be received cautiously and scrutinized carefully, for no form of evidence is more subject to error, falsification, and abuse. Witnesses, having no ulterior motive, are generally unable to state the exact language, or to reproduce the precise attitude or inflection of the speaker. Words, however true when spoken, are usually garbled in the retelling. The human fraility of exaggerating, of misquoting, or defective memory, makes this type of evidence of doubtful reliability. 2 *Jones Ev.* 295; *Eastern Shore Public Serv. Co. v. Town of Seaford,* (*Del. Supreme*) 2 *A.* 2*d* 265; *In re Missouri-Kansas Pipe Line Co.,* (*Del. Supreme*) 2 *A.* 2*d* 273. Mrs. Schilling's very reasonable explanation of the fact that the testatrix wanted to be with her when she cast her first vote left the incident without significance.

Finally, it is to be said that Mrs. Schilling was forced to undergo a long, repetitious, and at times, violent cross-examination. She was not entirely at home in the use of the English language, and displayed that awkwardness of phrase that is not unexpected where the speaker thinks in one language and expresses himself in another; but despite the entanglements and difficulties occasioned thereby, her testimony was frank, open and free, without attempt at concealment, reservation, evasion or equivocation.

All of the facts and circumstances have been considered carefully in the light of well understood principles of law applicable in such cases. There is no acceptable evidence of influence unduly exercised upon the testatrix by the beneficiary; and the conclusion is compelled that the instrument offered for probate expressed her free and unrestrained mind and will, and that the Register of Wills properly accepted it as such.

Next to be considered is the allowance of costs and expenses, including counsel fees.

*Section* 4907 of the *Revised Code* 1935, authorizes the Superior Court exercising appellate jurisdiction over the Register's Court to "make such order concerning costs in every case as shall be agreeable to equity".

█ Whether costs, counsel fees, and expenses of counsel are to be paid out of the estate must be determined from the circumstances of the case; and the rule, as it is related to the evidence of the case, is, if there was reasonable ground shown for resisting the will based upon competent evidence, an allowance should be made. *In re Warrington's Will*, 2 *Boyce* (25 *Del.*) 595, 81 *A.* 501; *Rodney v. Burton*, 4 *Boyce* (27 *Del.*) 171, 86 *A.* 826; *In re Salmon's Will*, 7 *Boyce* (30 *Del.*) 446, 108 *A.* 93.

█ The contest of a will should not be entered upon lightly, and the notion, sometimes entertained, that a will contest is a good speculation for the reason that it will cost the contestant nothing is one to be discouraged. Moreover, the Register of Wills sees and hears the witnesses. His decision with respect to costs ought not to be disturbed except upon clear grounds.

In the instant case, however, it is not a matter of the first importance whether the caveator has shown reasonable grounds for resisting the will based upon competent evidence. There is another reason, sufficient in itself, why the estate should not be burdened with the expense of the contest. It may be supposed that the proponent desired to have the case heard upon its merits, and, therefore, did not offer a defense which is decisive of the question of costs and expenses.

The procedure relative to the probate of wills is provided in *Article* 1, *Chapter* 98, *Revised Code* 1935 (*Sections* 3799-3803). *Section* 3799 provides that proof may be taken

without notice to "persons interested". *Section* 3800 provides for proceedings upon a caveat against the allowance of a will, and is silent with respect to those who may file a caveat. *Section* 3801 provides that "any person interested", not voluntarily appearing at the time of taking proof of a will, or served with citation or notice so to appear, shall at any time within one year after such proof have a right of review, upon which there shall be the same proceedings as upon a caveat; and the allowance of the will and the grant of letters may be affirmed, or the will rejected and the letters revoked. These provisions seem to have their origin in an act passed, February 16, 1829, and appearing in the *Code of 1829* at *page* 217. In that Act the first section embraced provisions for review and for caveat, in that order. "Any person interested" was given a right of review, but the next paragraph of the section, having to do with caveats, was silent as to who might file a caveat. In the *Code of* 1852, the order was changed, the provisions respecting a caveat being followed by the provisions as to a review, and what was *Section* 1, in the *Code of* 1829, was divided into four numbered sections. This order, and the same general provisions, have been maintained in all of the revisions of the laws.

As no one but a person interested may file a petition for a review, so likewise, none but an interested person may file a caveat against the allowance of a will. Generally, under such statutes, it is held that no person may contest a will who has no interest in the estate which may be affected by the probate of the proposed will; and the interest must be pecuniary and one detrimentally affected by the will, and not a mere sentimental interest. 28 *R. C. L.* 386; 68 *C. J.* 902, 928.

In all of the wills made and executed by the testatrix, the caveator was given nothing whatever; he was utterly ignored. The record shows that during the proceedings

before the Register it was insisted that the first will was the genuine or true will of the testatrix, and at the argument before this Court the same assertion was repeatedly made.

 A will adjudged to be void on the ground of undue influence, which is a species of fraud, can have no effect as a revocation of a prior will, 68 *C. J.* 807; and it being admitted that the first will was the true will of the testatrix, and it appearing from the proof that the entire estate of the testatrix was disposed of and that the caveator received nothing thereunder, it is impossible to see upon what theory the caveator had any standing before the Register to resist the probate, or here to prosecute an appeal. *Wilcoxon v. Wilcoxon,* 165 *Ill.* 454, 46 *N. E.* 369; *Cowan v. Walker,* 117 *Tenn.* 135, 96 *S. W.* 967; *In re Livingston's Estate,* 179 *Iowa* 183, 153 *N. W.* 200. Being a mere volunteer and having no right to contest the probate of the will, it is clear that the costs must be taxed against him, and that no allowance can be made for his expenses or counsel fees.

The decree of the Register of Wills is affirmed.