## In re the ESTATE OF Margaret A. WEST.

Supreme Court of Delaware.

Submitted: April 22, 1986.
Decided: March 23, 1987.

Joseph A. Hurley, Wilmington, for appellant.

George C. Hering, III (argued) and Kevin T. Peck, Morris, James, Hitchens & Williams, Wilmington, for appellee.

Before CHRISTIE, C.J., MOORE and WALSH, JJ.

MOORE, Justice:

David A. West appeals a post-trial decision of the Court of Chancery invalidating the last will and testament of his late mother, Margaret A. West, on grounds of undue influence. Suit was brought by the testatrix's daughter, Joan L. West, charging that her mother lacked testamentary capacity, or alternatively, that the will resulted from David's exertion of undue influence during their mother's last illness. The Vice Chancellor found that the mother had the requisite testamentary capacity, but sustained the claim of undue influence.

We have thoroughly reviewed the record, and must conclude from the independent undisputed evidence, and consideration of all the circumstances, that Joan West failed to prove by a preponderance of the evidence her claim of undue influence. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). Accordingly, we reverse.

## I.

We begin with the undisputed objective facts of record. Margaret A. West died on April 12, 1984 at the age of seventy-eight. Her adopted son, David, was fifty-one, married, and had been employed as a refinery mechanic welder at the same company for nineteen years. Joan West was fifty years old, and is the testatrix's natural daughter. The life styles of Joan and David have been markedly different. Joan attended two bible colleges shortly after high school, but never completed her course of study. In 1977, she entered a mental institution for approximately six months. At the time of trial Joan worked as an office cleaner, and had difficulty supporting herself. Joan has lived in Florida since 1977, and the evidence at trial indicated that her relationship with her mother was rather distant. Her aimless life style, choice of friends, and apparent financial irresponsibility had been sources of deep concern to her mother and brother. For example, in 1967, Joan and David each inherited separate houses in the resort community of Lewes, Delaware from their grandmother. Joan later decided to sell her house, and David, in an effort to keep it in the family, offered Joan $25,000, or $1,000 above her best offer. Rather than accept her brother's offer, Joan sold the house in 1978 for $15,000, and then dissipated the proceeds. All of this greatly distressed her mother.

On the other hand, David and his wife have worked hard, raised a family, and their relationship with Mrs. West was always one of love and affection. She referred to David's wife as her "daughter-in-love," and her relationship with David's

children obviously was close and loving. Over the years Mrs. West had relied on David to provide routine maintenance to her house, and to assist in minor chores.

Animosity has existed between Joan and David for most of their lives. David admitted that his relationship with his sister was rarely on good terms. In the past, he has referred to her as a "scrubwoman," the "town clown," and a "buffoon."

The challenged will was executed by Margaret West on April 10, 1984, two days before she died. It named David as sole beneficiary. This will superceded one dated September 6, 1977, which bequeathed a trailer to David, and placed the remaining assets in a residuary trust under which Joan was to receive the income for life, with the corpus to be distributed to various religious organizations upon Joan's death. It is undisputed that the mother was a very religious person. However, Mrs. West's religious focus apparently changed in her later years. She had regularly attended church and was active in its affairs, but her minister testified that although her faith remained spiritually secure, she stopped attending church in the last several months of her life.

The evidence clearly establishes that Mrs. West always was a very strong-minded and independent woman. She also had a total distrust of the medical profession. In her final months she limited her contacts with her minister, who on his last visit to her house, about a month before she died, was greeted by Mrs. West at the front door but not invited inside. About the same time she refused to permit acquaintances to discuss her condition with members of her family, and even threatened one person "never to speak" to her again if the subject was broached with David or Joan. Indeed, it was only after David found his mother collapsed on the floor of her house on April 4, 1984, that she even agreed to stay with David and his wife. The record, however, is absolutely clear that until this event Mrs. West lived at home, spurning all medical attention of any sort. For the next eight days, until her death on April 12, she lived at David's house, receiving constant care from David, his wife and family.

On April 6, Mrs. West first informed David that she wanted to change her will by naming him as her sole heir. At his mother's request, David contacted a lawyer to handle the matter. He first called his own attorney, who referred the matter to another member of the Bar, Aida Waserstein. Ms. Waserstein spoke with David briefly on the telephone, receiving general information from him. However, Ms. Waserstein never considered David as her client. Instead, the lawyer viewed herself as an independent advisor and counselor to Margaret West.

Thus, on April 9, Ms. Waserstein drafted a codicil to the 1977 will and spent about forty-five minutes alone with Mrs. West, in David's living room, reviewing the 1977 will and draft codicil. The precise circumstances of this interview are important and undisputed, although they were given scant attention by the trial court. Upon arriving at David's house, Ms. Waserstein found Mrs. West sitting on a couch in the living room. The lawyer introduced herself, asked to be left alone with her client, sat down next to her and began a discussion initially to ascertain Mrs. West's testamentary capacity. Thus, Ms. Waserstein testified:

> I proceeded to talk to her. I first tried to determine if she knew where she was and what year it was, and whether she was of sound mind, which she was, and then I tried to determine whether she was in severe pain or not because I wanted to make sure that her thinking was clear. And I was satisfied about that. She started offering me a lot of information also, and we talked for awhile. I asked her specifically what she wanted me to do, and she told me she wanted everything to go to her son, David ...

During this interview, a significant event occurred. Ms. Waserstein asked to see Mrs. West's 1977 will. The latter then asked David to go to her house, and gave him clear, specific instructions about locating a copy. David then left on this errand. Thus, not only was Ms. Waserstein alone in

the room with Mrs. West, but at his mother's direction David was out of the house. Ms. Waserstein specifically testified that during this time Mrs. West acted no differently than when David was at home but out of the room.

Upon David's return with the 1977 will, Ms. Waserstein discussed the earlier religious bequests with Mrs. West:

> So then I was alone with her again, and I spoke to her about whether she wanted these [religious] organizations to receive anything, because I wanted to make sure she understood that what I had drafted would not permit them to receive anything. She said no, and we talked about that for awhile.

Ms. Waserstein testified that throughout the meeting she was alert to any signs of a disruption, impairment or impingement upon Mrs. West's mental faculties, and found none. Had any existed, Ms. Waserstein stated that she would not have let Mrs. West sign the codicil. Thus, Ms. Waserstein concluded:

> I think she was of sound mind, and she knew what she was doing, and she was fully capable of writing, you know, executing a new will or a codicil.

Ms. Waserstein also testified regarding Mrs. West's decision to disinherit Joan:

> ... There was nobody else there, and she offered the information about her daughter having dissipated funds in the couple of years prior to the time I was talking to her, and it was very clear to me that she had made a decision that she didn't want her daughter to inherit anything, and this was one of the reasons why she had decided she didn't want her daughter to inherit at this time.
>
> Q: During the course of your discussion with her did you make it clear that the effect of this instrument was to totally disinherit, using my word, Joan, her daughter, from the estate?
>
> A: I made it very clear both as to the daughter and as to the charitable organizations that I mentioned previously.
>
> Q: ... Did she offer any explanation why she elected not to allow the religious foundations to receive anything, any funding?
>
> A: She did. I don't remember the details of it, but I do remember being very comfortable that religion had been very important in her life, and that these organizations were very central to her life back in '77 when she signed the first will, but that now she had made the decision that she didn't want it to go to them. I don't remember more details than that. I just remember satisfying myself that she understood what she was doing.

Further, Ms. Waserstein testified about Mrs. West's feelings toward David:

> About two or three times during the conversation when I was alone with her she wanted me to know, and she in fact was interested in having something in there that would exonerate Mr. West and the daughter-in-law from any possible liability of any question as to why she was not getting more medical care at that point. She had made a decision, and she gave me in detail the reasons for the experience that she had had earlier in the past where she had decided that she knew she was going to die; that she was very ill, and that she didn't prolong the process by trying to have medical procedures that could possibly do that but not really save her life or cure her.
>
> Apparently Mr. West had been really pressing her to go to the doctor, and wanted her to see a doctor, and she had to satisfy him I think a couple days before I saw her, but she wanted it to be very clear that she didn't want to do anything else. She didn't want anyone to say later that it had anything to do with her son or the daughter-in-law.
>
> She also at one point, I believe, offered the information that he was adopted, and in the context of even though he's adopted, he loves me and he's as good as—you know, he's a true son. And she did in several ways indicate her attachment to him and to the family.
>
> One other way she did it is that when we talked about the trailers—I believe she had three trailers and maybe three grandchildren who are maybe Mr. West's children, and she indicated that she knew

that David would do the right thing, and eventually the trailers or the proceeds of the trailers would go to the grandchildren because she trusted him totally.

Thereafter, the codicil was signed with certain handwritten additions and corrections made and initialed by Mrs. West. The use of a codicil was chosen by Ms. Waserstein because of the risk that Mrs. West would die before a will could be drafted and executed. However, Ms. Waserstein later conferred with her partner, Christine Dempsey, who suggested that a new will would be preferable in view of the radical changes effected by the codicil. After discussing the matter, Ms. Dempsey drafted a new will for execution by the testatrix.

Thus, at approximately seven o'clock p.m. on April 10, Ms. Dempsey called on Mrs. West, the new will was explained to her and then executed before three witnesses—David's wife, his daughter and his son-in-law. Ms. Dempsey testified that Mrs. West told her that Joan was being disinherited because she had squandered money through the years and also because she so loved her son. Ms. Dempsey was convinced that the testatrix understood all aspects of her estate's disposition.

Ms. Dempsey specifically testified about Mrs. West's testamentary capacity:

After I felt comfortable that she was competent—As a matter of fact, I was very surprised. I did not think that she was on her deathbed. I noted her color. It was pink. Her eyes were clear. She spoke very clearly to me. Her hair was very neat. She just had a very neat appearance, and there was no appearance really that she was in any way incapacitated.

She then addressed Mrs. West's decision to disinherit Joan:

Earlier that day when I had talked to Aida [Waserstein], Aida had mentioned that there was a possibility of trailers going to grandchildren. So I asked Mrs. West, I said, "Mrs. West, do you want the trailers to go to your grandchildren," and she said, "No. I want everything to go to David, and let him decide if the trailers should go to the grandchildren or not. It should be his decision, but I want everything to go to him."

\*   \*   \*   \*   \*   \*

There was a clause in the will, and I believe it's the fourth paragraph—I'm not accurate on that—the fourth paragraph which specifically recites the disinheritance. I read it to her, paraphrased it. I asked if that was her intentions. She said yes. I read it again to her, and I said, "Are you sure," and she said, "Yes. I want to disinherit my daughter."

Finally, Ms. Dempsey related her impression of Mrs. West's love and affection for David and his family:

As a matter of fact, one of the comments as his wife, Vivian, came into the house which shocked me at first because I thought maybe she doesn't have testamentary powers is that she said, "That's not my daughter-in-law," and I knew it was Mrs. West. I said, "What?" She said, "No. That's my daughter-in-love. She loves me so." The feeling that Mrs. West had towards the family was a feeling of love. She said that David cared for her, and that she felt that her daughter had just wasted money throughout her life, and that she had worked hard to obtain the house and to obtain the trailers, and she didn't want to see it wasted
. . .

On the same day that she executed the new will, April 10, another significant event occurred. Mrs. West received a telephone call from her pastor. They spoke for about five minutes. During the conversation she told the minister that although she felt very weak, she knew that spiritually she was safe and secure. She also reaffirmed her strong faith in a hereafter, and had absolutely no fear of death, which she shortly expected. Regarding her mental state, the pastor testified that she was:

Okay. I felt like *she was perfectly lucid and as rational and normal as ever.* I mean, that's the impression I got. I didn't think of it at the time because I didn't expect anything else,

and *she was just her normal self* except she was a little weak.

(Emphases added.)

The next day, April 11, Mrs. West evidently was bedridden, and for the first time David summoned the long-time family physician, Dr. Leroy R. Kimble, to check his mother, if she would permit, and to prescribe a wheelchair and bedside commode because of her weakened condition. Dr. Kimble arrived between six and seven p.m. and found Mrs. West in bed. Even though she had not consulted Dr. Kimble for about sixteen years, Mrs. West immediately recognized him, and without prompting called him by name. While agreeing to see the physician, she made it a condition that she neither be treated nor hospitalized. From a short examination it was obvious to the doctor that, although not in pain, Mrs. West was suffering from advanced metastatic cancer. Nonetheless, he found her lucid with her mental faculties intact.

Dr. Kimble suggested that David and his wife apply warm compresses to a particularly large mass on Mrs. West's side to facilitate its draining. They did so throughout the night, and in the early morning hours of April 12, Mrs. West died peacefully.

During this entire period of Mrs. West's final illness, Joan was absent in Florida. She has no personal knowledge of any of the foregoing events. Thus, her case depended strongly on the questionable testimony of her longtime and very close friend, Linda Fleetwood. Their relationship dated from 1956, when Mrs. Fleetwood was sixteen and Joan was twenty-one years old. According to Mrs. Fleetwood, Joan was like a "big sister," who began calling Linda on the phone, and thereafter, from 1956 to 1958, Mrs. Fleetwood spent weekends at the West house. While Mrs. Fleetwood remained close to Joan, and as will be seen was the catalyst of this litigation, she was erroneously described by the trial court as a "long-time" friend of Mrs. West. In fact, Mrs. Fleetwood did not stay in regular contact with Mrs. West until the latter part of the testatrix's life. The "long-time" friendship was with Joan, not Mrs. West.

From November 1983 until April 1, 1984, the last day Mrs. Fleetwood saw Mrs. West, the former observed a steady physical decline in the testatrix. She described her last visit to Mrs. West's house on April 1, 1984. On that day Mrs. West called and insisted that Mrs. Fleetwood, despite the latter's claim of illness, come to visit. She arrived about noon and was shocked by Mrs. West's appearance—dressed in shabby "bed clothes," her hair "like a wild woman," and her false teeth out. Prior to that, Ms. Fleetwood had always admired Mrs. West's neatness and careful attention to her personal appearance.

Mrs. Fleetwood wanted to call Joan or David, but Mrs. West was adamant that they not be told of her condition. Indeed, she became quite angry over Mrs. Fleetwood's attempted intervention. Mrs. Fleetwood also testified that she came on this visit with the specific intention of discussing Mrs. West's will and the disposition of her estate. There was such a discussion, and Mrs. Fleetwood apparently satisfied herself that Joan was the principal life beneficiary of Mrs. West's estate.

While Mrs. Fleetwood testified that they prayed together and parted as friends, shortly thereafter she received a letter from Mrs. West, dated April 4, stating in part:

Linda, you are the biggest fake I ever met. Linda, you better lock yourself in your room until Christ takes over. Your family knows what you are. I feel so sorry for your family living with such a hypocrite.

Although Mrs. Fleetwood professed great concern for Mrs. West, she did not want to talk to her again, prior to receiving the April 4 letter, or even to learn if she was alive. She gave the curious explanations that "I have a very busy schedule, and I have many things to do" and that "I wanted to remember her the way I last left her"—i.e., unkempt, hair like a "wild woman," no teeth, and gravely ill.

After Mrs. West died, it is clear that Mrs. Fleetwood became the organizing force of this litigation with three other women who were "concerned about Joan

getting protected." They encouraged Joan to seek legal counsel, and in fact, Mrs. Fleetwood took Joan to a lawyer (not her present counsel) and paid the initial attorney's fee. At trial Mrs. Fleetwood admitted that Joan had not repaid her for this expense.

Throughout her testimony Mrs. Fleetwood seemed to have total recall of any event she perceived as favorable to Joan, while failing to remember other things, or giving inconsistent statements respecting them. Thus, she testified on her deposition that she had not given copies of Mrs. West's 1977 and 1984 wills to anyone, when in fact she had done so to help Joan organize this litigation. Although she had professed close friendship with the Wests, she had never met David until Mrs. West's funeral and had spoken to him only once on the phone—on April 5 after receiving Mrs. West's April 4 "Linda, you are the biggest fake" letter. On her deposition she was quick to accuse David of holding his mother "incommunicado" and wanting to call the police because he would not let her speak with his mother after the "fake and hypocrite" letter. Yet, at trial she said, "It's his mother. He may do what he wishes with her."

Significantly, unlike four independent witnesses who saw or talked with Mrs. West between April 9 and 11—two lawyers, a clergyman, and a physician—Mrs. Fleetwood had no knowledge of Mrs. West's actions, her mental state, or the circumstances that led to the drafting and execution of the 1984 codicil and will.

## II.

◼ In reviewing the factual findings of a trial judge, this Court may review the entire record and, when the findings of the court below are clearly wrong and the doing of justice requires their overturn, we are free to make contradictory findings of fact. *Levin v. Smith*, Del.Supr., 513 A.2d 1292, 1301 (1986); *Levitt v. Bouvier*, Del. Supr., 287 A.2d 671, 673 (1972). This is such a case.

The Vice Chancellor found that Mrs. West had sufficient testamentary capacity to execute her 1984 will, but ruled it invalid as the product of undue influence. In finding testamentary capacity, the trial court reasoned:

> On the issue of testamentary capacity, the evidence establishes that Mrs. West's personality changed and that she suffered periods of confusion at various times during the months before the 1984 will was executed. There can be no question but that Mrs. West was on her death bed when she signed the will and her extremely poor health during the preceding week is evidenced by the fact that she remained at David's house notwithstanding her strong desire to remain independent and care for herself . . .

> This evidence suggests a woman so ravaged by disease and so close to death as to be unable to understand that she was disposing of her estate and to whom she was leaving her property. However, I find the opposing testimony of Ms. Waserstein and Ms. Dempsey to be credible and worthy of weight. They both understood that Mrs. West was gravely ill and went to some effort to explain the codicil and will respectively to Mrs. West. They were both satisfied that she understood what the documents were designed to accomplish and that David would receive everything to the exclusion of Joan.

> I have totally discounted the opinions of Reverend Cerrato and Dr. Kimble on the grounds that neither of them had sufficient contact or asked sufficient questions to determine Mrs. West's mental condition . . .

> There being credible evidence of approximately equal weight in support of each position, the decision on testamentary capacity necessarily turns on the burden of proof. [Joan West] bears that burden and I conclude that she has not established by a preponderance of the evidence that Mrs. West lacked testamentary capacity at the time the 1984 will was executed.

*Matter of West*, Del.Ch., No. 248, 1985, slip op. at 9–11 (June 20, 1985) (Berger, V.C.).

In finding that David exerted undue influence over Mrs. West's decision, the Vice Chancellor inferred:

... David had the opportunity to exert influence inasmuch as he was at home all day with his mother and Mrs. West had little or no contact with anyone other than David and his family. David had a disposition to exert undue influence for an improper purpose in two respects. First, he stood to gain by obtaining a new will naming him as the beneficiary. Second, the evidence establishes that David and his sister never got along and David's animosity towards Joan was apparent at the trial ...

... The conclusion is inescapable that the real reason Dr. Kimble was called was to help create a record for the anticipated will contest ...

... Mrs. West's strong religious convictions remained firm until her death, yet not one witness was able to provide any explanation for Mrs. West's purported desire to eliminate those religious bequests from her will ...

... I conclude that Mrs. West eliminated the religious bequests as a result of undue influence by David.

*Matter of West,* slip op. at 11–13.

### III.

■ We first address Joan West's contention that her mother lacked testamentary capacity to execute the 1984 will. Here, the standard is that one who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what he or she is doing and how he or she is disposing of his or her property. The person must also possess sufficient memory and understanding to comprehend the nature and character of the act. Thus, the law requires Mrs. West to have known that she was disposing of her estate by will, and to whom. *Matter of Langmeier,* Del.Ch., 466 A.2d 386, 402 (1983).

■ Delaware law presumes that the testatrix had sufficient testamentary capacity when executing her will, and the party attacking testamentary capacity bears the burden of proof. *Matter of Langmeier,* 466 A.2d at 389. It is important to note that only a modest level of competence is required for an individual to possess the testamentary capacity to execute a will. *Estate of Rasen,* Me.Supr., 447 A.2d 1220, 1222 (1982).

■ We agree with the trial court's finding that Mrs. West possessed sufficient testamentary capacity to execute the 1984 will. The testimony of Ms. Waserstein and Ms. Dempsey, describing their lengthy discussions with the testatrix prior to execution of the 1984 codicil and will, balance any evidence that Mrs. West's advanced illness may have destroyed her testamentary capacity. Further, the testimony of other independent witnesses, who saw and/or spoke with Mrs. West during her final days, convince us that she was of sound mind. Dr. Kimble was immediately recognized and called by name, even though Mrs. West had not consulted him for over sixteen years. He noticed no unusual signs when he examined her less than twelve hours before her death, and Robin Pokoy, David's daughter, spent approximately four hours with her grandmother during her final days and did not notice any deviation from the testatrix's normal mental state. In addition, Mrs. West's pastor found her "rational and normal as ever" on the very day she executed her will.

### IV.

Thus, we turn to the contention of undue influence. Delaware law recognizes that:

... Undue influence is an excessive or inordinate influence considering the circumstances of the particular case. The degree of influence to be exerted over the mind of the testator, in order to be regarded as undue, must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to compel him to make a will that speaks the mind of another and not his own. It is immaterial how this is done, whether by solicitation, importunity, flattery, putting in fear or some other manner. Whatever the means employed, however, the undue in-

fluence must have been in operation upon the mind of the testator at the time of the execution of the will ...

*Matter of Langmeier*, 466 A.2d at 403.

■ The essential elements of undue influence are: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and, (5) a result demonstrating its effect. *Nardo v. Nardo*, Del.Supr., 209 A.2d 905, 912–13 (1965); *Matter of Langmeier*, 466 A.2d at 403.

■ While ignoring the testimony of four independent witnesses, the trial court concluded from scant evidence, equally indicative of mutual love and affection between mother and son—Mrs. West's illness leading to her presence in David's house, the loving care he and his family gave her, David's hostility to Joan, and revocation of the 1977 will—that opportunity and motive had been established. However, Delaware law requires the party alleging undue influence to prove its actual exertion by a preponderance of the evidence. *Matter of Langmeier*, 466 A.2d at 389. While relevant to the inquiry, opportunity and motive, standing alone, do not establish a charge of undue influence.

■ Both the attorneys, Waserstein and Dempsey, observed no signs that Mrs. West was under any undue influence when they spoke at length, and alone, with her during her last days. Neither attorney had any motive to ignore or suppress signs that Mrs. West was susceptible to David's alleged importunities. To the contrary, both testified that the testatrix exhibited an independent mind and clearly stated her reasons for changing the beneficiaries. Consistent with the high ethical standards required of them, they were bound, and acted, to ensure that Mrs. West's actions were the product of her own free will.

Another factor we have observed from the physical evidence is that the testatrix's signatures on the 1984 codicil and will show no signs of tremor or weakness. If anything, they are remarkably similar to her signature on the revoked 1977 will.

Joan's prior conduct, however, lends much credibility to Margaret's fears that her daughter would dissipate the inheritance originally contemplated in the 1977 will. Mrs. West's elimination of certain religious bequests is not fatal. The two independent lawyers, Ms. Waserstein and Ms. Dempsey both explained her wishes in this regard, and Reverend Cerrato, Mrs. West's pastor, testified to her changed religious focus.

The Vice Chancellor conceded that there is no direct evidence that David actually exerted any improper influence, but dismissed his testimony as self-serving and lacking in credibility. Normally, that is a proper exercise of discretion, but in reaching its conclusions of undue influence, the trial court did not undertake the required five step analysis mandated by *Nardo* and *Matter of Langmeier*.

Analyzing the elements of undue influence, we recognize the possibility that Mrs. West, being very ill, could have been a susceptible testator; that her presence in David's house provided an opportunity to exert influence; and that the alleged animosity between David and Joan could have been a motive for influencing the testatrix. However, the validity of a will does not turn on mere possibilities. Joan has not established an actual exertion of influence or any result demonstrating its effect. The disposition according to the 1984 will is consistent with a change of heart by Mrs. West, a change expressing her belief, communicated to two independent lawyers, and based on rational considerations, that her daughter did not deserve any part of the estate.

Furthermore, given the undisputed independent evidence, we cannot conclude that this record even supports a finding of susceptibility. In addition, there is simply no evidence that David actually exerted undue influence. In *Conner v. Brown*, Del.Super., 3 A.2d 64 (1938), the court correctly held that the mere opportunity to influence is insufficient:

... [T]he fact that the proponent of a will had an opportunity, at the date of its execution, to exercise undue influence, raises no presumption that he did so; nor

does the mere existence of confidential relations between the testator and beneficiary; nor the alteration of an existing will arbitrarily and without reason; nor the mere fact that a testator disposes of his property unequally, or in a manner which may seem unreasonable; for a testator having capacity, and acting freely, may dispose of his property as he sees fit.

*Id.* at 71.

That describes the situation here. Joan West had the burden of establishing undue influence, but failed to present evidence of David's exertion of *any* undue influence. Establishing the opportunity and motive for influencing an allegedly susceptible testatrix is simply insufficient to invalidate a will under Delaware law.

Thus, the trial court erred in halting its undue influence analysis after finding a susceptible testator; the opportunity to influence; and the disposition to do so for an improper purpose. With the record devoid of any evidence indicating the actual exertion of improper influence, the Vice Chancellor's conclusion, that opportunity and motive to influence a susceptible testatrix necessarily establishes the actual exertion of improper influence and a result demonstrating its effect, does not comport with Delaware law. While recognizing that Mrs. West may have had valid grounds to disinherit Joan, the trial judge somehow concluded that the testatrix's elimination of the religious bequests inescapably led to an inference of undue influence. Given the law and this record, any such conclusion does not meet the tests of review mandated by *Levitt v. Bouvier.* Mrs. West could have deleted the religious bequests for a host of valid reasons. In the absence of evidence indicating an actual exertion of undue influence, the mere fact that she eliminated the religious organizations from her new will does not lead to an "inescapable" conclusion of undue influence. Thus, from the evidence presented, and considering all the circumstances, Joan West did not sustain her burden of establishing the existence of undue influence.

The law disfavors invalidating a will absent strong evidence mandating such drastic action. This is especially so where, as here, two equally plausible reasons exist for the late change in beneficiaries. Based on this scant record the trial court found undue influence, but the same facts comport with the equally plausible conclusion that Mrs. West merely had a change of heart, and determined that her worldly belongings should pass to her son, who she always had held in the highest esteem and affection. Given the life-long loving relationship between David's family and Mrs. West, and David's loving care of her during her last dying days, who "is to say that under such circumstances wealth and fortune cannot assume a secondary role to the comfort derived from knowing that in your last days there is someone who truly seems to care?" *Matter of Langmeier,* 466 A.2d at 398. As noted in *Conner v. Brown:*

... [A] will which is solely the outcome of kindness, induced by acts of attention or service to a [testatrix] in caring for [her], even where such acts are actuated by a selfish motive, is not a will procured by undue influence; nor will the employment of flattery, appeals to the affection or pity of the [testatrix], or persuasion or importunity falling short of coercion, constitute undue influence.

3 A.2d at 71.

In our opinion the 1984 will is valid, and for the foregoing reasons, the judgment of the Court of Chancery must be REVERSED.