FRANK SLOAN and JACK SLOAN, Petitioners Below-Appellants,
v.
LOUIS SEGAL, Respondent Below-Appellee.
No. 289, 2009.
Supreme Court of Delaware.
Submitted: March 19, 2010.
Decided: May 10, 2010.
Before HOLLAND, BERGER, and RIDGELY, Justices.

ORDER
HENRY DuPONT RIDGELY, Justice.
This 10th day of May 2010, it appears to the Court that:
(1) Petitioners-below Frank and Jack Sloan (collectively the "Appellants") appeal the Court of Chancery's decision validating Patricia Sloan's ("Patricia") 2003 Codicil resulting in a distribution of the assets from a trust created by Martin Sloan ("Martin") (the "Martin Sloan Trust") to Louis Segal ("Louis"). Appellants make three arguments on appeal. First, Appellants contend that the Court of Chancery's finding that Patricia wanted to support Louis was clearly erroneous. Second, Appellants contend that the Court of Chancery erred in failing to consider the criminal aspects of Louis' actions in refusing to apply the Clean Hands doctrine. Third, Appellants contend that the Court of Chancery's holding that Louis met his burden of proof to establish the validity of the July 1, 2003, Codicil was clearly erroneous. We find no merit to Appellants' arguments and affirm.
(2) This is a dispute over the distribution of the assets of the Martin Sloan Trust. The parties are Martin's three stepsons: Petitioners-Appellants Frank and Jack Sloan and Respondent-Appellee Louis, who are all brothers and the sons of Patricia from her first husband. Under the Martin Sloan Trust Agreement, unless Patricia exercised the power of appointment in her last will by specific reference to it, the balance of the Martin Sloan Trust was to be distributed equally between Jack and Frank. The issue before the trial court was whether Patricia had effectively exercised this power of appointment.
(3) Martin died October 9, 1989. Four months after his death, Appellants sent a letter to Patricia alleging Patricia's ongoing pattern of abusive behavior towards all three of her sons. Essentially, they told Patricia that unless she was willing to begin therapy with a competent psychiatrist, they would not be involved in her life anymore, would not visit if she was institutionalized, and would not come to her funeral. On July 2, 1990, Louis sent a handwritten note to Patricia stating that he was unable to express his feelings any better than Appellants had, and attached a copy of their letter. Sometime in 1991, Louis re-established a relationship with Patricia which continued until her death on July 1, 2006. This relationship included phone calls and twice-yearly visits  at Christmas and Patricia's birthday  for several weeks at either Louis' home in Florida or Patricia's home in Delaware. Appellants never again spoke to Patricia.
(4) Patricia disposed of the assets held in her own trust (the "Patricia Sloan Trust") through a "Declaration of Trust" and its later multiple amendments. Patricia disposed of her tangible personal property, real property and, importantly, the assets over which she had a power of appointment through her wills. Patricia's January 25, 1991 will and Declaration of Trust of the same date, provides that each of her sons would receive equal $25,000 shares from Martin and Patricia's trust assets. Martin's remaining assets were to be held in trust for his and Patricia's grandchildren, and Patricia's remaining assets were to go to a charitable fund.
(5) In November 1991, Patricia executed amendments to her Will and Declaration of Trust, eliminating Appellant's inheritance from both Martin and Patricia's assets entirely. Further, Louis was to receive $500,000 from both the Martin Sloan Trust and the Patricia Sloan Trust. The remainders of each trust were to go to the grandchildren and charity, respectively. In May 1993, Patricia modified the Patricia Sloan Trust only to the extent of making $200,000 of Louis' inheritance an outright gift.
(6) The next change in Patricia's estate planning was in September of 2001. The Court of Chancery found that this appeared to be prompted by Louis' pseudo-marriage to Deborah Peduto, who had two children from a previous marriage.[1] On September 26, 2001, Patricia amended the Patricia Sloan Trust to change Louis' inheritance from a regular trust to a charitable remainder unitrust[2] with Louis as the income beneficiary. Patricia did not alter her earlier exercise of the Power of Appointment over the Martin Sloan Trust in favor of Louis. Further, she explicitly disinherited Appellants by amending the definition of "issue" to exclude Appellants.[3] This amendment was prepared by counsel.
(7) Patricia spent the 1990s and early 2000s living alone in the Park Plaza condominium building in Wilmington, Delaware. In the early part of 2002, Patricia began to show increasing signs of aging, mental impairment and confusion. George Sturgis, a security guard at Park Plaza, testified at trial that Patricia had become noticeably less alert and more forgetful in the five years he knew her from 1997 through 2002. Daniel Talmo, the manager of Park Plaza, testified that he recalled that Louis was worried that Patricia was not properly caring for her health, and that at some point a social worker visited Patricia to assess her health. He further testified that Patricia began asking other Park Plaza residents to drive her places, which made some of the residents uncomfortable. Because of these events, Talmo wrote a letter to Louis indicating that, although Patricia was welcome to stay at Park Plaza, she might be better suited at an assisted living facility that could provide her with more support.
(8) As Patricia's ability to care for herself declined, Louis took control of her legal and financial affairs. Patricia granted Louis a broad power of attorney on May 16, 2002, and added Louis as an authorized user to her personal checking account in July 2002. Around this time, Louis retired and began living off of Patricia's money. He explained that Patricia wanted Louis to "handle things for her . . . so she wanted to support [him] so that [he] wouldn't have to work and [he] would have more time to be with her and take care of her affairs."
(9) One of Louis' first actions as Patricia's financial manager was to attempt to remove the trustees of the Martin Sloan Trust. Patricia had at one point been the trustee, but had resigned in favor of David Craig and Louis Sloan, Patricia's brother-in-law. The trust administrator did not accept Louis' May 17, 2002 letter on behalf of Patricia revoking her resignation. Louis next wrote to the trustees, asking them to move the assets in the Martin Sloan Trust to the Patricia Sloan Trust. They refused, and Louis filed suit in the Court of Chancery on October 15, 2002, seeking the records of the Martin Sloan Trust and disbursement of the Trust's funds to himself. Louis was not candid, and did not tell the Court of Chancery that he was already using Patricia's funds to pay his own bills. Rather, Louis initially appeared on behalf of himself and Patricia in the action and presented himself as solely concerned with Patricia's best interests.
(10) Further, Louis involved himself in Patricia's legal affairs, without retaining counsel, despite the fact that he was not a member of any state's bar nor had he received any legal education. Louis testified that Patricia felt the September 2001 documents creating the charitable remainder unitrust did not reflect her wishes, and asked Louis to draw up new documents. He drafted a fifth amendment to the Patricia Sloan Trust, which Patricia executed on April 12, 2002. Under this amendment, Louis remained the income beneficiary of the charitable remainder unitrust, but Louis' income benefits were directed to Peduto and her children, rather than charity, in the event Louis predeceased Patricia. To document Patricia's capacity to sign testamentary instruments, Louis brought Patricia to meet with a psychologist, Dr. Jay Weisberg, to assess her mental competence and ascertain how she wanted to dispose of her property. Dr. Weisberg determined that Patricia exhibited mild memory impairment, but that she was "oriented and competent to make decisions about her estate." In response to Dr. Weisberg's questions, Patricia explained that she did not want to distribute any of her estate to Appellants because of their falling-out, nor did she want to distribute anything to her grandchildren because none had maintained a relationship with her. Dr. Weisberg stated that Patricia understood that Louis' interest in her will was self-serving, but nevertheless felt that Louis "was really the only relative she had a close relationship with and thereby felt she should leave all of her possessions to him."
(11) In early August 2002, Patricia's declining mental and physical health made it no longer practical for Patricia to live by herself. Louis made arrangements for her to move to Florida and live with Louis and Peduto and attend an adult daycare program at a nearby assisted living facility called Courtyard Gardens. Louis brought Patricia to see her longtime physician in Delaware, Dr. Robert Altschuler, on August 8, 2002, to fill out a health assessment form required by Courtyard Gardens. Dr. Altschuler diagnosed Patricia with "moderate dementia" due to episodes of confusion that Patricia had experienced.
(12) Patricia further amended her will in August 2002, (the "August 2002 Will"), which named Louis as the executor and sole beneficiary of the estate. Unlike all of Patricia's earlier wills it did not contain a specific reference to the Power of Appointment. On the day Patricia executed the August 2002 Will, Louis brought Patricia back to Dr. Weisberg for another evaluation. Dr. Weisburg diagnosed Patricia with "mild dementia" during the visit, but nevertheless found her competent to sign the will. He further found that Patricia wanted to disinherit Frank and Jack and leave the bulk of her estate to Louis, consistent with the intent she had expressed to Dr. Weisberg in May.
(13) Patricia moved to Florida on August 31, 2002, and moved into Louis and Peduto's home. Early in Patricia's stay, she wandered out of the house and had to be retrieved from a nearby restaurant by the police because she was confused and disoriented. In late September, Louis made arrangements for Patricia to move to Courtyard Gardens full time to the Azalea Wing, a secure wing of the facility designed for patients with dementia or other problems that might cause them to wander off. Patricia had access to her private room, common areas, and a walled-off garden. Staff members accompanied Patricia to the general areas of Courtyard Gardens so she could participate in various activities, and either Louis and Peduto or a caretaker hired by Louis took Patricia out to dinner twice a week. Patricia also joined Louis, Peduto, and Peduto's family for holidays and family gatherings.
(14) On October 18, 2002, prior to Patricia moving into the Courtyard Gardens, Patricia executed a new will drafted by Louis. (the "October 2002 Will") This will was identical to the August 2002 will, except that it changed Patricia's residence from Delaware to Florida. Louis did not bring Patricia to any doctor to evaluate her competence at the time the October 2002 Will was executed.
(15) While Patricia was in the Courtyard Gardens, Louis continued to handle all of her affairs. Patricia did not have a telephone in the Courtyard Gardens, and all of her mail was sent to Louis' home or held for Louis to pick up at the Courtyard Gardens. Louis continued to pay Patricia's bills and write all of her checks, as he had done since July 2002. In March 2003, Louis obtained a limited voluntary guardianship from a Florida probate court over Patricia's property to press the claims regarding the assets of the Martin Sloan Trust on Patricia's behalf. Louis failed to disclose to both the Florida probate court and the Court of Chancery that, at that time, Patricia was living in a secured facility for dementia patients. In a May 27, 2003 conference, the Court of Chancery informed the parties that the assets of the Martin Sloan Trust could not be transferred to the Patricia Sloan Trust.
(16) In July 2003, Louis drafted a codicil ("July 2003 Codicil") to the October 2002 Will to address the lack of a power of appointment. The July 2003 Codicil distributed "all of the principal of the [Martin Sloan Trust], outright and free of trust, that is then remaining at the time of [Patricia's] death to [her] oldest son, Louis Segal." Louis did not take any steps to ensure the validity of the July 2003 Codicil could not be questioned. By coincidence, July 1 was a day that Dr. Lori Lynn Dowie, a primary care physician who made house calls to the residents of Courtyard Gardens, came to check on Patricia. Dr. Dowie indicated in her records that Patricia's condition was no different that it had been in her previous checkups, and that Patricia had "mild dementia", was oriented to time and person, but not to place.
(17) Patricia fractured her hip in early 2004, and her health continued to decline until her death on July 1, 2006. Louis did not probate her October 2002 Will in Florida, and thus no court had previously ruled on the validity of the October 2002 Will or the July 2003 Codicil. Appellants filed a complaint in the Court of Chancery on August 6, 2006, contending that the July 2003 Codicil was executed while Patricia lacked testamentary capacity or was the result of undue influence from Louis. At trial, the Court of Chancery excluded the deposition of Appellants' counsel Dr. Bill because counsel had not informed Appellee's counsel or the Court that there was an availability problem. Ultimately, the Court of Chancery held that the July 2003 Codicil was binding, and directed the trustees of the Martin Sloan Trust to distribute the assets to Louis.
(18) On November 23, 2009, this Court held that the exclusion of Dr. Bill's testimony was improper and remanded this matter to the Court of Chancery to address whether consideration of Dr. Bill's testimony would have changed the outcome of this case. On January 27, 2010, the Court of Chancery determined that even if Dr. Bill's testimony had not been excluded, it would not have affected the court's determination. Specifically, it held:
As I indicated, I read the entirety of Dr. Bill's testimony. Nothing in it persuades me that the measured conclusions I previously reached were erroneous. At best, Dr. Bill speculates that [Patricia] might have had some unexpressed change of heart and desired to leave wealth to [the Appellants] despite: (1) the total absence of any effort on their part to resume contact with her; and (2) the total lack of any effort by Frank and Jack to foster a relationship between their children and their grandmother, [Patricia]. Indeed, Dr. Bill admits he is speculating in this regard.
As important, a fair reading of Dr. Bill's testimony overall tends to support, not rebut, my conclusions. Dr. Bill concedes that there is no substantial basis to believe that [Patricia]'s mental state was materially different between August 2002 (when [Appellants] admit she was competent) and July 2003 when she executed the Codicil. Dr. Bill concedes that he has no reason to doubt that [Patricia] expressed a clear desire to Dr. Weisberg to leave nothing to [Appellants]. Dr. Bill also testified as to his high regard for Dr. Tavini, whose testimony buttressed the conclusions I previously reached, and whose testimony is consistent, unlike Dr. Bill's, with the physician, Dr Dowie, who was in close contact with [Patricia] during the relevant time.
All in all, Dr. Bill provides no rational basis to conclude [Patricia] had any intention to leave wealth to two sons who abandoned her and whose sole reaction to her aging and change of residence to Florida involved maneuvering to try to secure wealth at her disposal.[4]
(19) Appellants contend that the Court of Chancery's conclusions that Patricia wanted to support Louis and that Louis' alleged material misrepresentations to a Florida probate court were merely euphemisms are clearly erroneous.
(20) We review factual conclusions by the Court of Chancery to determine whether they are clearly erroneous and not supported by credible and sufficient evidence in the record.[5] To the extent the conclusions by the Court of Chancery involve mixed questions of law and fact our scope of review is de novo.[6]
(21) In support of Appellant's contention that Patricia did not intend to support, Louis they list seven specific circumstances and items of evidence contradicting the trial court's conclusion: 1) Louis' pattern of concealing his retirement and source of income; 2) Louis' power of attorney did not permit Louis to make gifts to himself nor did it waive fiduciary duties owed to Patricia; 3) Peduto did not know what Louis' source of income was; 4) the pattern of transfer of Patricia's wealth to Louis is consistent with taking and inconsistent with receiving; 5) after Patricia moved into the secured dementia unit Louis was not "spending so much time with her or managing her affairs as to preclude him from employment;" 6) no federal gift tax returns were prepared or filed by either Louis or Patricia; 7) Dr. Weisberg testified that Patricia never indicated to him that she wanted to support Louis so he could retire.
(22) The Court of Chancery considered all the evidence presented in this case, including the specific information listed by Appellants on appeal. The evidence, considered as a whole, supports the Court of Chancery's conclusion that Patricia desired to distribute her wealth to Louis and to specifically exclude Appellants from such disbursement.[7] The Court of Chancery's findings are not clearly erroneous and are supported by credible and sufficient evidence in the record.
(23) Appellants also contend the Court of Chancery erred in refusing to consider the alleged criminal conduct by Louis when it declined to apply the Clean Hands doctrine. It is a maxim of equity that "[he] who comes into equity must do so with clean hands" and the doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case.[8] "[T]he decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine [of unclean hands]."[9] Although extensive and broad, the discretion of the Court is not absolute and "the improper conduct must relate directly to the underlying litigation."[10] The "inequitable conduct must have an `immediate and necessary' relation to the claims under which relief is sought.'"[11]
(24) The Court of Chancery held that "[t]hese claims are far beyond the scope of the Complaint in this action and are irrelevant to the question of whether Patricia validly exercised the Power of Appointment."[12] We agree. The question before the Court of Chancery was whether the July 2003 Codicil was valid. The Court of Chancery did not err in refusing to apply the doctrine of Unclean Hands against Louis.
(25) Appellants next contend that Louis failed to meet his burden of proof to establish the validity of the July 2003 Codicil under Florida or Delaware law. The Court of Chancery held, and the parties agreed, that it is unnecessary to determine whether Florida or Delaware law applies to this case as the outcome would be the same if the analysis was under either body of law.[13]
(26) Generally, a party challenging a duly executed will must overcome a presumption that the will is valid.[14] Under the standard established in Melson, the burden of proof shifts to the proponent of the will where the party challenging the will demonstrates by clear and convincing evidence that: 1) the will was executed by a testator who was "of weakened intellect"; 2) the will was drafted by a person in a confidential relationship with the testator; and 3) the drafter received a substantial benefit under the will.[15] If this showing is made, the burden shifts to the proponent of the will to prove by a preponderance of the evidence that the testatrix possessed the requisite testamentary capacity and to show the absence of undue influence.[16]
(27) The Court of Chancery found that each of the three Melson factors applied, and shifted the burden to Louis to prove by a preponderance of the evidence that Patricia possessed the requisite testamentary capacity and to show the absence of undue influence. The record supports this conclusion, as here Patricia suffered from mild to moderate dementia, the will was prepared by her son who had power of attorney and a limited guardianship over her property, and the July 2003 Codicil conferred the benefit of receiving all of the Martin Sloan Trust upon Louis.
(28) To possess testamentary capacity, a testator must "be capable of exercising thought, reflection and judgment, and must know what he or she is doing and how he or she is disposing of his or her property.[17] The person must also possess sufficient memory and understanding to comprehend the nature and character of the act."[18] "It is important to note that only a modest level of competence is required for an individual to possess the testamentary capacity to execute a will."[19]
(29) The Court of Chancery's finding that Patricia possessed sufficient testamentary capacity to execute the July 2003 Codicil is supported by the record. The testimony of Dr. Dowie, a disinterested witness and Patricia's treating physician, stated that Patricia's condition was stable and that Patricia had the ability to make her own decisions about her property on July 1, 2003. Further, the testimony of Dr. Weisberg indicated that in August 2002, Patricia had mild dementia but was capable and competent to sign a will. The evidence supports the Court of Chancery's conclusion that it was more probable than not that Patricia had sufficient testamentary capacity to execute the July 2003 Codicil.
(30) For influence by a beneficiary to be undue over a testatrix it must rise to the level as to "subjugate his mind to the will of another, to overcome his free agency and independent volition, and to compel him to make a will that speaks the mind of another and not his own."[20] The elements of undue influence are: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect.[21]
(31) The Court of Chancery found that: (1) Patricia was a susceptible testator because she was of weakened intellect and awareness; (2) Louis had the opportunity to exert influence as he drafted the Codicil himself; and (3) Louis had a motive to exert influence because he stood to benefit financially from such action. The Court of Chancery further found that elements 4 and 5 were not present in this case.
(32) This Court has held that the existence of the opportunity to exert undue influence and a motive to do so is not enough to invalidate a will; rather there must also be actual exertion of improper influence and a result demonstrating its effect.[22] The result of the 2003 Codicil was to exclude Appellants from receiving any of Patricia's estate and to dispose of her assets to Louis. This result is consistent with the numerous Wills and Amendments thereto drafted by Patricia from 1991 to the October 2002 Will. Further, this result is consistent with Patricia's intention, as shown by Dr. Weisberg's testimony, Patricia did not want Frank and Jack to have anything due to their lack of a relationship with her. The record supports the Court of Chancery's finding that Patricia had testamentary capacity on July 1, 2003, and that she was free from undue influence when she executed the 2003 Codicil.
NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is AFFIRMED.
NOTES
[1] Louis and Peduto exchanged private vows, which Patricia flew to Florida to witness, on September 4, 2001. Luis and Peduto did not legalize their marriage.
[2] A charitable remainder unitrust is an estate planning vehicle that pays a donee a fixed percentage of the trust's value for a certain period of time, and then gives the remaining property to charity.
[3] "Issue" was defined as: "`Issue' of a person means all the lineal descendants of that person of all generations (excluding, however, for all purposes herein, FRANK SLOAN and all of his issue, and JACK K. SLOAN and all of his issue)." First Codicil of Patricia R. Sloan dated September 26, 2001.
[4] Sloan v. Segal, 2010 WL 363848, at *2, *4 (Del. Ch. Jan. 27, 2010).
[5] Homestore, Inc. v. Tafeen, 888 A.2d 204, 217 (Del. 2005); Levitt v. Bouvier, 287 A.2d 671, 673 (Del. 1972).
[6] Wedderien v. Collins, 2007 WL 3262148 (Del. Nov. 6, 2007); Zirn v. VLI Corp., 681 A.2d 1050, 1055 (Del. 1996).
[7] For example, the court relied on the testimony of Dr. Dowie, Dr. Altschuler and Dr. Weisberg. Dr. Dowie testified that Mrs. Sloan knew her own mind, expressed opinions and desires, and was strong-willed and exercised her rights. Dr. Altschuler, Mrs. Sloan's treating physician, testified that he felt she was competent to sign any documents in April and May of 2002. Dr. Weisberg testified that between May 12, 2002, and August 28, 2002, he saw no dimunition of Mrs. Sloan's mental capacity and that she was a resolute woman. The court also considered Dr. Tavani's testimony regarding her review of the professional medical records in evidence regarding Mrs. Sloan's intellect. Sloan v. Segal, 2009 WL 1204494, at *14-16 (Del.Ch. April 24, 2009).
[8] Nakahara v. NS 1991 American Trust, 718 A.2d 518, 522 (Del. Ch. 1998).
[9] Id.
[10] Id. (citing Walter v. Walter, 136 A.2d 202 (Del. 1957).
[11] Id. (citing Kousi v. Sugahara, 1991 WL 248408 (Del.Ch. Nov. 21, 1991).
[12] Sloan v. Segal, 2009 WL 1204494, at *17.
[13] Sloan v. Segal, 2009 WL 1204494, at *13. See Viking Pump, Inc. v. Liberty Mut. Ins. Co., 2007 WL 2752914, at *26 n.113 (Del.Ch. Apr. 2, 2007).
[14] In re Will of Melson, 711 A.2d 783, 786 (Del. 1998).
[15] In re Will of Melson, 711 A.2d at 788.
[16] Id.
[17] In re Estate of West, 522 A.2d 1256, 1263 (Del. 1987).
[18] Id.
[19] Id.
[20] Id. (quoting Matter of Langmeier, 466 A.2d 386, 403 (Del.Ch. 1983)).
[21] Id. (citing Nardo v. Nardo, 209 A.2d 905, 912-13 (Del. 1965)).
[22] In re Estate of West, 522 A.2d at 1265.