# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| In the Matter of the Estate of | ) | |
| ALBERT J. VIETRI, SR., deceased | ) | |
| | ) | |
| CHRISTINE VIETRI, ALBERT J. | ) | C.A. No. 2020-0806-PWG |
| VIETRI, JR., and VINCENT J. VIETRI | ) | |
| | ) | |
| Petitioners/Caveators | ) | |
| v. | ) | |
| | ) | |
| PAULA VIETRI | ) | |
| | ) | |
| Respondent. | ) | |

## MASTER'S REPORT

Date Submitted: May 20, 2022
Final Report: August 31, 2022

David J. Ferry, Jr., Esquire, Brian J. Ferry, Esquire, Timothy R. Akers, Jr., Esquire, FERRY & JOSEPH, P.A., Wilmington, Delaware, *attorneys for Petitioners/Caveators, Christine Vietri, Albert J. Vietri, Jr., Vincent J. Vietri*

Lydia E. York, Esquire, L.E. YORK LAW, LLC, Wilmington, Delaware, *attorney for Respondent, Paula Vietri*

**GRIFFIN, Master**

Three children of decedent filed a caveat against the allowance of decedent's 2020 will, claiming that he lacked testamentary capacity and was unduly influenced by a fourth sibling when he executed the will one day before his death. They ask the Court to invalidate the 2020 will and demand an accounting and surcharge from the fourth sibling for financial transactions she conducted for their father before and after his death. The fourth sibling denies that decedent's 2020 will was invalid. I find that the caveators have not proven decedent lacked testamentary capacity or was unduly influenced when he executed the 2020 will and hold that the 2020 will is valid. Accordingly, I recommend that the Court deny both the caveat against the allowance of the 2020 will and the caveators' demand for an accounting and surcharge. This is a final report.

## I.     Background[1]

*A. Factual Background*

Albert J. Vietri, Sr. ("Decedent") and Barbara Vietri, had four children, Caveators Christine Vietri ("Christine"), Albert J. Vietri, Jr. ("Albert"), Vincent J. Vietri (collectively "Caveators"), and Respondent Paula Vietri ("Paula").[2] Barbara died in

---

[1] I refer to the trial transcript as "Trial Tr.," to the joint trial exhibits as "JX" with the Bates stamp numbers found at the bottom of the exhibit pages, where applicable, and to Resp't Ex. 1.

[2] Docket Item ("D.I.") 55, ¶¶ 1-4. I use first names in pursuit of clarity and intend no familiarity or disrespect.

1

June of 2002.[3]  Decedent was described as "very warm," "family oriented," also "ornery" and that he would "butt heads" with his children at times.[4]  It appears that the siblings have had volatile relationships at times.[5]  Decedent resided at 1612 Maple Street, Wilmington, Delaware ("Home") until his death.[6]

1. Decedent's Medical History and Decline

After Decedent had his first stroke in March 2013, Christine and Albert, who both lived nearby, took turns caring for him.[7]  Decedent had another stroke in September 2016 and a third stroke in March 2017.[8]  The strokes left him with weakness in his right side, difficulty swallowing (dysphagia) and, by February 2020, difficulty speaking (dysarthria/asphasia).[9]  Between September to November of 2017, Christine moved in with Decedent to help care for him and worked out of an office in the Home, and Albert continued to help.[10]  On March 3, 2018, Paula, who

---

[3] Trial Tr. 22:2-3.

[4] *Id.*, 14:9-16; *id.* 197:9-13; *id.* 242:6-10.

[5] *Id.* 181:17-24; *id.* 186:15-21; *id.* 187:5-9; *id.* 194:21-195:4; *id.* 197:9-11; *id.* 239:5-7.

[6] D.I. 55, ¶5.

[7] Trial Tr. 16:12-17:8.

[8] JX R, 01104-01105.

[9] *Id.*, 01095-01097.  Decedent's medical history in Christiana Hospital records on February 14, 2020 listed "dysarthria," *see* JX S, 01174, while Dr. Ciarlo, Decedent's doctor for 18 years, testified in his deposition that the "last time I saw him, he did not have an aphasia." JX R, 01088, 01106.  Dr. Ciarlo last saw Decedent in September 2019. *Id.*, 01110.

[10] Trial Tr. 18:17-19:13.

is a travel nurse, moved into the Home.[11]  She did not have an established residence at that time.[12]  She became involved with Decedent's care and Christine testified that Paula's involvement with his care made it "difficult [for her] living in the Home" and, in June 2018, Christine moved downstate and got married.[13]  Paula testified that she "stayed with her father because there was no one else there,"[14] and she was Decedent's sole caregiver after Christine left the Home until his death on July 8, 2020.[15]  She resented that she "was stuck doing all the work."[16]

Decedent's health continued to decline in 2020 and he needed increasing assistance from Paula.[17]  He was admitted to the hospital on February 14 - 19, 2020 for pain after a fall at Home.[18]  The hospital notes describe him as "awake and alert,

---

[11] *Id.* 18:17-21.  Her moving into the Home was not at Decedent's invitation. *Id.* 243:21-24.

[12] *Id.* 183:22-184:22.

[13] *Id.* 20:21-21:8; *id.* 186:22-187:9; *id.* 256:15-16. Christine testified that she "snuck out while [Albert] was away on vacation …because [she] knew of the repercussions."  *Id.* 52:21-53:3.

[14] *Id.* 256:10-11.

[15] *Id.* 266:3-8.  Paula testified that she intended a brief stay, then Christine moved out, and she suffered a series of health issues that she had that prevented her from working. *Id.* 197:19-200:23; *id.* 198:17-199:20 (Paula did not start working again until October 2020).

[16] *Id.* 499:17-23.

[17] *Id.* 294:9-296:11 (she assisted him with his personal hygiene, helped him use a stair lift to go from his bedroom downstairs, made his food, helped him stand up with the wheelchair behind him, but he would drink and feed himself and read the newspaper); *see also id.* 15:19-16:4.

[18] JX S, 01170, 01174.

answers questions appropriately … speech is soft but is not labored and nonslurred."[19]

He was again admitted to the hospital on April 15 - 17, 2020 for "altered mental status," based upon Paula's statement that he was having visual hallucinations.[20] The hospital notes indicated that he had been diagnosed with a urinary tract infection ("UTI") and treated with a medication that "can certainly cause hallucinations in the elderly."[21] At his discharge on April 17, 2020, the hospital notes describe him as "alert and oriented x 3."[22]

On June 1, 2020, Decedent was referred to hospice, with Paula stating that he "wants no further hospitalizations."[23] She also indicated that he was "confused with increased agitation at night, "says nonsensical things," and the hospice nurse noted he "is exhibiting [symptoms] of UTI."[24] On June 3, 2020, the hospice nurse described Decedent as "awake and alert in bed," "oriented X3 but is forgetful at

---

[19] *Id.*, 01179, 01181.

[20] *Id.*, 01189, 01193 (he was seeing ants and mice that weren't there), 01198; *see also* Trial Tr. 45:20-46:8 (Christine testified that Decedent would hallucinate and confuse her with her deceased mother (but did not provide time frames for those actions)).

[21] JX S, 01197; *see also id.*, 01193.

[22] *Id.*, 01190. On May 6, 2020, Decedent saw his doctor (not Dr. Ciarlo), who noted that he "went to ER [illegible] confusion … no further dreams … more oriented this AM." JX G, 00079.

[23] JX H, 00107.

[24] *Id.*, 00107, 00108.

4

times … has very hoarse voice and garbled speech at times."[25]  Another nurse described him, on June 5, 2020, as "clear cognitively at times but is confused or unable to be understood at most times."[26]  On June 8, 2020, his speech was described as "garbled but he can make his needs known."[27]  There were a number of cancelled hospice visits in June.[28]  Decedent was discharged from hospice on June 29, 2020 when he was admitted to the hospital for a choking episode/aspiration pneumonia.[29]  At his admission, he was described as "awake and alert however given significant dysarthria it is difficult to understand.  He seems to be oriented to his date of birth and his location in the hospital."[30]  The hospital notes on July 1, 2020 reported that Decedent complained about not having been discharged and that "[h]e says 'if I only have a little time left, I want to go to the beach.'"[31]  He was discharged on July 1, 2020, with the hospital notes at discharge stating he was "alert and oriented to self, place and situation … speech is slurred at baseline, voice is hoarse."[32]

---

[25] *Id.*, 00109.

[26] *Id.*, 00111.

[27] *Id.*, 00114.

[28] *Id.*, 00118-00123.

[29] *Id.*, 00123, 00127, 00379.

[30] JX I, 00384.

[31] Resp't Ex. 1, Progress Note Hospitalist, 7/01/2020 16:38.

[32] JX I, 00376, 00381.

After Decedent was discharged from the hospital, Paula delayed his readmission to hospice so that they could go to the beach to see her daughter, Nina Vietri ("Nina").[33] They stayed with Nina and her then boyfriend until returning to the Home on July 5, 2020, accompanied by Nina and her boyfriend.[34] Nina testified that Decedent had not taken morphine while staying with her, and, on July 5th, Decedent was in "horrible shape" and she knew she "only had a few days left with him."[35] Hospice notes indicate that a hospice nurse met with Decedent in the evening of July 5, 2020 and Paula administrated morphine that night, which addressed Decedent's pain.[36] And, on July 6, 2020, Paula contacted hospice to discuss equipment and "client's rapid decline."[37] On July 6, 2020, all of Decedent's children and grandchildren came to the home, at Paula's suggestion, to see Decedent.[38] Christine described Decedent as lying down in his bedroom, looking "so small, old," and barely able to talk or move.[39] She testified that he "knew who

---

[33] *Id.*, 00434. Nina testified that her relationship with Paula was "always up and down." Trial Tr. 81:15-16.

[34] Trial Tr. 85:18-20; *id.* 93:22-24; *id.* 94:5-9.

[35] *Id.* 94:16-95:17.

[36] JX J, 00437. Paula initially testified that he didn't receive morphine on July 5, 2020, *see* Trial Tr. 313:14-18, but subsequently stated that she forgot administering morphine that night. *See id.* 317:1-318:2.

[37] JX J, 00437. Decedent was in his regular bed until a hospital bed was delivered to the Home on July 6, 2020. Trial Tr. 285:23-286:5.

[38] Trial Tr. 31:14-32:8.

[39] *Id.* 33:14-21.

we were" and "was glad to see us."[40] Eventually, Decedent "wanted to get up and come downstairs to the kitchen" to be part of the "goings on," and his sons brought him downstairs in his wheelchair.[41] He spoke with family members, mostly individually, that day.[42] During his time with family, neither Decedent nor Paula mentioned that he was going to sign a will the next day.[43] Decedent did not receive morphine on July 6, 2020 and was next administered morphine in the early afternoon (after the will signing) on July 7, 2020.[44]

2. Decedent's Estate Plans and Power of Attorney

Decedent altered his estate plans over the years – his November 22, 2000 will devised his estate equally to his four children,[45] and his July 6, 2004 will divided his estate unequally among his children (35% to each son and 15% to each daughter).[46] On August 28, 2013, he executed a will again dividing his estate equally among his

---

[40] *Id.* 34:10-12. Nina testified that Decedent was unable to "get words out" only the last two days. *Id.* 90:3-19.

[41] *Id.* 34:17-35:6; *id.* 89:2-18.

[42] *Id.* 370:6-21.

[43] *Id.* 90:20-24; *id.* 36:10-20; *id.* 274:4-10. She testified that she waited until July 7, 2020 for Decedent to sign the will because she "was scared of what would happen," that Christine, Albert and Vincent would be upset, and she "really didn't want to do it." *Id.* 350:24-351:15.

[44] *Id.* 313:10-13.

[45] JX B.

[46] JX C.

children.[47]   On July 25, 2019, Decedent executed a durable personal power of attorney ("POA") appointing Paula as his agent and Albert as his successor agent.[48] Paula testified that she had use of Decedent's debit card and paid his bills, only using his home equity line for home purposes.[49]   She testified Decedent wanted to change his will around that time but didn't because Albert said "no."[50]

In March 2020, Paula testified that Decedent met with Ciro Poppiti, Esquire, on April 7, 2020, who subsequently declined to prepare his will because of a conflict but provided attorney referrals.[51]   She testified that, through those referrals, she contacted Raymond Tomasetti, Esquire ("Tomasetti"), at Decedent's request.[52] Tomasetti testified that, after his office was contacted on June 1, 2020, they sent out a questionnaire asking for information about Decedent's estate and estate plans.[53] He further testified that his first meeting with Decedent was an in-person meeting in

---

[47] JX D.

[48] JX E.   Paula testified that Albert was present when Decedent signed the power of attorney. Trial Tr. 270:10-14.   Ciro Poppiti, Esquire, likely prepared the POA since he notarized it. JX E.

[49] Trial Tr. 194:10-13; *id.* 504:14-506:15.   She testified that she paid off her car herself in September 2021. *Id.* 504:22-505:2.   Christine alleged that Paula used Decedent's money "for herself." *Id.* 54:23-24.

[50] *Id.* 203:4-10.   Paula testified that in May 2019 she contacted Michael Pedicone, Esquire, who had prepared Decedent's wills previously, at Decedent's request, and learned that Pedicone no longer prepared wills. *Id.* 201:1-3; *id.* 202:11-203:13.

[51] *Id.* 205:16-210:4.

[52] *Id.* 210:10-17.

[53] *Id.* 373:21-374:6.

his Fenwick Island office on or about June 17, 2020.[54] He recalled aspects of the discussion with Decedent on June 17, 2020, including Decedent mentioning another attorney, Ciro Poppiti, having "general conversation … to build up a relationship," and going through the information about Decedent's assets and beneficiaries, etc., on the questionnaire.[55] He didn't recall any discussion about Decedent disinheriting Caveators at the meeting.[56] Tomasetti testified that he didn't know who brought Decedent to the meeting because he excludes anyone except the person, and he did not have any conversations with Paula.[57] He stated he was easily able to communicate with Decedent at the June 17th meeting.[58] Because the will was prepared during the height of the COVID-19 pandemic, Tomasetti typed the draft will and cover letter dated June 19, 2020 and mailed it to Decedent himself.[59]

---

[54] *Id.* 374:24-375:1; *id.* 394:14-23. He testified that the meeting was originally scheduled as a June 16, 2020 teleconference but that meeting was cancelled. *Id.* 374:19-23. Paula testified that the meeting with Tomasetti was a video conference, but subsequently changed her testimony to state that she had taken her father to Tomasetti's office on June 17, 2020, but had just not remembered. *See id.* 211:10-15; 493:10-495:19. I find her testimony less credible than Tomasetti's.

[55] *Id.* 374:18-377:3; *id.* 397:15-17; *id.* 405:6-406:23.

[56] *Id.* 376:11-13; *id.* 407:16-24 ("Many clients make [disinheriting their children] important. I don't make it important, but they do. They will tell me the why, or the personal stories they will tell me.").

[57] *Id.* 375:8-13; *id.* 392:15-20; *id.* 403:5-15. Paula confirmed that she had never spoken to Tomasetti before July 7, 2020, *see id.* 333:13-17, and she testified the 2020 Will was her father's volition and his doing. *Id.* 517:20-518:1.

[58] *Id.* 408:10-12.

[59] *Id.* 377:4-12; *see* JX X.

9

Decedent's July 7, 2020 Will ("2020 Will") disinherited Caveators and left everything to Paula if she survived him (and to Nina, if she did not).[60]  On July 7, 2020, Tomasetti went to the Home for Decedent to sign the 2020 Will and noticed a difference in Decedent from the June 17th meeting – his speech was impaired, he had a "garbled voice," appeared to be "paralyzed on his right arm," and was "embarrassed he couldn't sign" the 2020 Will.[61]  Tomasetti first met with Decedent alone in Decedent's bedroom to review the 2020 Will, recalling that Decedent practiced signing his name, and Decedent's statement that he wished he were "dead."[62]  He didn't remember Decedent saying anything else.[63]  Then Tomasetti brought the witnesses into the room and thought there may have been family members in the room at that time.[64]  Decedent had difficulty signing the 2020 Will but signed both the Will and the self-proving affidavit.[65]  Tomasetti gave the executed 2020 Will to either Paula or another family member and told them to put it

---

[60] JX F.  It also appointed Paula as his executrix. *Id.*

[61] Trial Tr. 378:17-23; *id.* 394:15-17; *id.* 408:13-409:23.  Paul testified that she called Tomasetti's office, at Decedent's request, about the will signing when they were at the beach and his office chose July 7, 2020 for the will signing. *Id.* 326:2-330:3.

[62] *Id.* 379:2-18; *id.* 409:15-410:10; *id.* 421:11-422:16.

[63] *Id.* 418:16-419:4.

[64] *Id.* 379:19-380:1.

[65] *Id.* 379:9-381:19 (Decedent "struggled on the first one [signing the will] but did better on the second one [self-proving affidavit]").

in a safe, and left the Home.[66] He estimated that the signing process took no longer than one-half hour.[67]

One of the witnesses to the 2020 Will signing, a neighbor, Crystal Williams ("Williams"), confirmed Tomasetti's testimony that he went upstairs to meet with Decedent before asking the witnesses to come up.[68] She testified that she, Decedent, another neighbor who served as a witness, and Tomasetti were in the room when the Will was signed, she was present throughout the signing, and that Nina was in the room "on and off."[69] She testified that Tomasetti started by saying that "we are all here for the witnessing of [Decedent's] signing of the will" and asked if Decedent understood and Decedent nodded; Decedent nodded when Williams greeted him; and Decedent directed the dog to jump down twice when it jumped on her.[70] The witnesses confirmed to Tomasetti that they weren't coerced into being witnesses.[71]

---

[66] *Id.* 380:2-9.

[67] *Id.* 422:23-423:3; *see also id.* 346:18-24.

[68] *Id.* 450:22-451:4; *id.* 453:16-21. Paula testified that she arranged for the witnesses. *Id.* 331:14-332:6.

[69] *Id.* 454:7-19; *id.* 474:19-21. Williams described Decedent as sitting upright in bed, propped up by pillows. *Id.* 454:3-6; *id.* 472:24-473:1.

[70] *Id.* 454:22-455:4*; id.* 455:15-18; *id.* 469:15-20; *id.* 475:2-17; *id.* 484:19-24.

[71] *Id.* 475:9-15. Williams testified that she did not discuss the 2020 Will with Paula. *Id.* 455:22-456:6.

11

Tomasetti handed Decedent the 2020 Will and Williams saw Decedent sign the 2020 Will.[72]

### 3. Decedent's Condition at the 2020 Will Signing

By July 7, 2020, Decedent couldn't take care of himself and needed Paula's assistance in all activities of daily living, except feeding himself.[73] Nina testified that she was present when Decedent signed the 2020 Will but doesn't recall him signing the self-proving affidavit.[74] She remembered Decedent being "confused" and saying to her "[t]his is not right, this is not right."[75] She claimed that Decedent was not competent to sign the 2020 Will, and was influenced by Paula and Tomasetti.[76] Christine, who was not present at the 2020 Will signing, testified that

---

[72] *Id.* 476:11-20.

[73] *Id.* 310:19-312:24. Paula testified that he was dependent on her but "also had a voice." *Id.* 312:12-13.

[74] *Id.* 96:22-97:1; *id.* 97:22-23. She also claimed to be in the room with Decedent when Tomasetti came up, *see id.* 98:18-20, but also said that the day was "foggy because [she] wasn't paying attention," and doesn't remember who let the witnesses or the attorney in. *Id.* 99:10-15.

[75] *Id.* 101:1-3.

[76] *Id.* 104:20-23 (Decedent would not have wanted to sign the 2020 Will because he "lived for his children."); *id.* 105:9-16.

she doesn't believe Decedent knew what he was signing.[77]  Paula testified that Decedent was "awake, alert, oriented … [h]e knew what was going on."[78]

Melissa Breslin ("Breslin"), a hospice CNA, testified that she saw Decedent the day before and the day he died.[79]  She described Decedent during her visit on July 7, 2020, which occurred around two hours after he signed the 2020 Will as "very tired and sleeping," "his face was a little more drawn," and his "breathing was a little different," so that he was "getting ready to pass soon, within a day or two."[80]  She testified that he "was more alert" and "would speak" during past visits, but this time "he didn't speak … he looked at me and, because [Paula] told him I was in the room, then he went back to sleep."[81]  She opined that Decedent would not have been able to understand a will earlier that day.[82]

---

[77] Christine testified that because "[h]e would have never signed if he really knew" because "he was all about his family and his children and everything." *Id.* 41:23-42:6.  She also testified that he did not speak about his estate plans on July 6, 2020, had never showed her any of his wills, and she referred to his estate plans to split everything equally among the children as around the time of her mother's death in 2002 and then after his first stroke in 2013. *Id.* 21:20-22:6; *id.* 36:17-20; *id.* 67:10-24.

[78] *Id.* 340:23-24.

[79] *Id.* 137:20-21.

[80] *Id.* 145:19-147:24.  Paula testified that she didn't recall Breslin being at the Home on July 7th. *Id.* 355:24-356:1; *id.* 358:14-22.

[81] *Id.* 148:5-19; *see also id.* 162:7-9.

[82] *Id.* 151:15-22.

Williams testified that Decedent was alert, oriented and aware – he knew what he was signing.[83] Tomasetti indicated that he has made determinations in the past that a person wasn't competent to sign a will, and has performed basic tests on a person or requested medical documentation.[84] He testified that he didn't employ a test because he thought Decedent was competent and of sound mind, and he was not aware of any undue influence.[85]

Decedent died the next day, July 8, 2020, at 3:42 p.m.[86]

## B. Procedural History

On September 21, 2020, Caveators filed the Caveat Against Allowance of Instrument as a Will and for Related Relief ("Caveat") claiming that the 2020 Will was invalid because Decedent lacked testamentary capacity and Paula exerted undue influence over him.[87] Caveators moved to compel Paula to respond to their

---

[83] *Id.* 454:5-6; *id.* 472:24-473:1; *id.* 484:8-17.

[84] *Id.* 437:5-438:13. He further indicated that he normally would address capacity issues with a client at the first meeting. *Id.* 443:15-24.

[85] *Id.* 441:6-17; *see also id.* 433:1-4; *id.* 438:19-439:3. Paula did not speak to Tomasetti and did not tell his staff about Decedent's medical history or previous hallucinations, although she did indicate that Decedent had "gotten weaker." *Id.* 336:9-337:10.

[86] JX A.

[87] D.I. 1. On November 19, 2020, Paula requested an extension to file a response and, on November 20, 2020, was granted the extension until December 4, 2020. D.I. 8. On December 7, 2020, Paula requested another extension. D.I. 10. Caveators opposed the second extension on December 11, 2020. D.I. 11. A second extension was granted until December 28, 2020. D.I. 12. Paula requested an additional extension on December 31, 2020. D.I. 13.

discovery requests on January 20, 2021, who responded on February 17, 2021.[88]

Paula, who was acting *pro se*, filed an answer to the Caveat on February 24, 2021, and an answer in corrected format on March 3, 2021, denying their claims.[89]  During the March 8, 2021 hearing on the Motion to Compel, I stayed my decision pending Paula's production of documents, and the parties agreed to participate in mediation.[90] Mediation was held on June 30, 2021 but was unsuccessful.[91]  Caveators continued to engage in discovery, and filed a motion to compel inspection of the Home.[92]  At a September 7, 2021 hearing on that motion, the parties agreed to an inspection date for the Home.[93]  Caveators filed a motion for leave to amend the Caveat on September 21, 2021, which was granted on October 28, 2021.[94]  The Amended Caveat, which added a demand for an accounting and for a surcharge against Paula, was filed on October 29, 2021.[95]  On November 29, 2021, Caveators filed a motion

---

[88] D.I. 15; D.I. 21.

[89] D.I. 22; D.I. 24.

[90] D.I. 27.  Caveators' counsel reported, on March 10, 2021, that all requested documents had been produced. D.I. 28.

[91] D.I. 35.

[92] D.I. 37; *see also* D.I. 29; D.I. 30; D.I. 31; D.I. 33; D.I. 34; D.I. 36.

[93] D.I. 42. The parties also agreed to the case schedule order (with revisions) and another attempt at mediation. *Id.*  Subsequent to that hearing, Caveators advised that they no longer believed mediation would be productive. D.I. 46.

[94] D.I. 45; D.I. 53; D.I. 54.

[95] D.I. 55.

for default judgment against Paula for her failure to answer the Amended Caveat.[96] The decision on that motion was reserved at the January 20, 2022 hearing.[97] On February 1, 2022, counsel for Paula entered her appearance and Paula filed an answer to the Amended Caveat on February 9, 2022.[98] Following the pre-trial conference, the trial was held on April 5 and 6, 2022, and the matter was taken under advisement.[99] Caveators filed their post-trial submission on May 19, 2022, and Paula filed her post-trial submission on May 20, 2022.[100]

## II. Analysis

Caveators are challenging the validity of the 2020 Will under 12 *Del. C.* §1308, claiming Decedent lacked testamentary capacity and the 2020 Will was a product of undue influence. "A duly-executed will is presumptively valid and free of undue influence."[101] "Delaware law presumes that the [testator] had sufficient

---

[96] D.I. 57.

[97] D.I. 62. Paula was given until February 1, 2022 to respond and a revised case schedule order entered. D.I. 62; *see also* D.I. 61; D.I. 70.

[98] D.I. 64; D.I. 66; D.I. 68.

[99] D.I.73. The pre-trial stipulation and order was granted as modified at the pre-trial conference. D.I. 75. Following trial, Caveators' counsel was to advise regarding supplementing the court record and he indicated, on April 11, 2022, that no supplementation was requested. D.I. 80; D.I. 81. On April 13, 2022, I advised counsel that simultaneous closing submissions will be filed 30 days following publication of the trial transcript on the docket. D.I. 82.

[100] D.I. 87; D.I. 88.

[101] *In re Hammond*, 2012 WL 3877799, at *3 (Del. Ch. Aug. 30, 2012).

testamentary capacity when executing [his] will, and the party attacking testamentary capacity bears the burden of proof."[102]  Similarly, the challenger "carries the burden of proving that the will was a product of undue influence."[103]  To have Decedent's 2020 Will declared invalid, Caveators have the burden of showing Decedent lacked testamentary capacity when he executed the will or that the 2020 Will was a product of undue influence.  In addition, Caveators demand an accounting and a surcharge from Paula for her actions as Decedent's agent.[104]  I address each claim in turn.

## A.  Did Decedent have Testamentary Capacity?

The first question is whether Decedent had testamentary capacity when he executed the 2020 Will.  The standard for testamentary capacity "is that one who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what he or she is doing and how he or she is disposing of his or her property."[105]  Decedent must "have known that [he] was

---

[102] *In re West*, 522 A.2d 1256, 1263 (Del. 1987) (citing *In re Langmeier*, 466 A.2d 386, 389 (Del. Ch. 1983); *see also In re Baran*, 2017 WL 2491517, at *5 (Del. Ch. May 26, 2017) ("Delaware law disfavors invalidating a testamentary plan and this Court therefore presumes that a will is valid, that a testator possessed testamentary capacity at the time he executed a will, and that the will was not the product of undue influence."); *In re Justison*, 2005 WL 217035, at *6 (Del. Ch. Jan. 21, 2005).

[103] *In re Justison*, 2005 WL 217035, at *6; *see also In re Will of Cauffiel*, 2009 WL 5247495, at *7 (Del. Ch. Dec. 31, 2009).

[104] *See* D.I. 55, ¶¶ 33-37.

[105] *In re West*, 522 A.2d at 1263.

17

disposing of h[is] estate by will, and to whom."[106] "It is important to note that only a modest level of competence is required for an individual to possess the testamentary capacity to execute a will."[107]

Here, Decedent was in declining health, had suffered three strokes and had related medical conditions (dysphagia and dysarthria/asphasia).[108] There are instances that his medical documentation indicates he suffered from hallucinations and confusion during 2020, although those conditions appear to have occurred when Decedent had a UTI or had taken medication that can cause hallucinations.[109] Following his hospitalizations in 2020 (February, April and July 2020), hospital notes state that Decedent was alert and oriented to self, place and situation at his discharge each time.[110] Hospice notes (beginning in June 2020), and hospital notes during his last admission (June 29 – July 1, 2020), addressed his increasing difficulty

---

[106] *Id.*

[107] *Id.*; *see, e.g., In re Est. of DeGroat*, 2020 WL 2078992, at *16 (Del. Ch. Apr. 30, 2020) ("The evidence shows that while [testator] had memory problems, could not handle his more complex financial and residential affairs, and was even losing the ability to drive, he retained testamentary capacity."); *In re Macklin*, 1991 WL 9981, at *2 (Del. Ch. Jan. 23, 1991) (finding that age-related deterioration reflected in driving deficiencies, memory problems, a "shambles" of a home, and shortcomings in personal grooming, does not "establish[ ] that degree of deterioration that deprives one of testamentary capacity").

[108] *See supra* notes 7-9 and accompanying text.

[109] *See supra* notes 20-22, 24, 26 and accompanying text; *see also* Trial Tr. 306:24-307:2. Christine testified that Decedent had confusion and hallucinations previously but she did not see Decedent from mid-February 2020 until July 6, 2020, *see id.* 63:15-19, and she did not indicate that he experienced any hallucinations on July 6, 2020. *See id.* 33:20-34:12.

[110] *See supra* notes 19, 22, 32 and accompanying text.

in speaking.[111]     After Decedent's discharge from the hospital on July 1, 2020, and during his visit to the beach from July 1 – 5, 2020, he was undisputedly in rapid decline.[112]   He met with his children and grandchildren on July 6, 2020 and made known that he wanted to leave his bedroom and join the family downstairs, which he did.[113]   On July 7, 2020, when he signed the 2020 Will, one of the witnesses, Williams, testified that he understood what he was doing and signing.[114]   The attorney, Tomasetti, met with Decedent in-person on June 17, 2020 and testified that he easily communicated with him, had a general conversation and discussed Decedent's estate plan as reflected in his questionnaire.[115]   He then met with Decedent on July 7, 2020 to review the 2020 Will before having the witnesses come up for Decedent to sign the 2020 Will, and recalled that Decedent appeared "different," his speech was impaired, he had difficulty signing the 2020 Will, and made only one statement – that he wished he were "dead."[116]  But Tomasetti testified that he thought Decedent was competent and of sound mind.[117]  Paula opined that

---

[111] *See supra* notes 25-27, 30, 32 and accompanying text.

[112] *See supra* notes 35, 37 and accompanying text.

[113] *See supra* notes 38-42 and accompanying text.

[114] *See supra* note 83 and accompanying text.

[115] *See supra* notes 54, 55, 58 and accompanying text.

[116] *See supra* notes 61, 62 and accompanying text.

[117] *See supra* note 85 and accompanying text.

Decedent was alert and aware, while Nina testified he was not.[118]  I find Paula's statement self-serving, and Nina's testimony unpersuasive (since Nina focused on statements allegedly made by Decedent that the 2020 Will was "not right," which were not heard by Tomasetti or Williams).[119]  Breslin testified that she thought Decedent would not understand a will when she saw him two hours after the 2020 Will signing, but I consider that testimony in the context that Breslin did not communicate with Decedent, who was sleeping at the time she was in his room.[120]

I conclude that Caveators have not overcome the presumption that Decedent possessed testamentary capacity, or "a modest level of competence," at the time he executed the 2020 Will.[121]  There is no evidence that Williams or Tomasetti were not independent witnesses and I find their testimony, and the evidence overall, shows

---

[118] *See supra* notes 76, 78 and accompanying text.

[119] *See supra* notes 74, 75.  Christine also testified that Decedent was not alert or aware, but she was not present at the will signing or aware of it. Trial Tr. 31:4-11.  Caveators relied on deposition testimony of Decedent's long-time doctor, Dr. Ciarlo to support their claim that Decedent lacked testamentary capacity at the will signing. D.I. 87, at 18-19.  Dr. Ciarlo testified at his deposition that he was not asked to provide a note about Decedent's capacity related to signing the 2020 Will and he would not have done so if asked. JX R, 01120-01121.  However, I find his testimony on Decedent's capacity as of July 7, 2020 unpersuasive, since he had not personally seen Decedent since September 2019 and he appeared to base his conclusion on hospital records but it is unclear whether he reviewed all of the hospital records in detail. *Id.*, 01085, 01110.

[120] *See supra* notes 80-82 and accompanying text.  The evidence does not show that Decedent's capacity when signing the 2020 Will was affected by medication – he had been administered morphine on July 5, 2020 but did not receive morphine again until after signing the 2020 Will on July 7, 2020. *See supra* notes 36, 44 and accompanying text.

[121] *See supra* note 106 and accompanying text.

20

that Decedent understood what he was doing in disposing of his property through the 2020 Will. Therefore, I recommend the Court deny Caveators' claim that the 2020 Will was invalid because Decedent lacked testamentary capacity.

*B. Was the 2020 Will a Product of Undue Influence?*

Next, I address whether the 2020 Will was a product of undue influence. "To be considered undue, the amount of influence exerted over the testator's mind 'must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to impel him to make a will that speaks the mind of another and not his own.'"[122] The "essential elements of undue influence are: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and, (5) a result demonstrating its effect."[123] The elements must be proven by a preponderance of evidence.[124] If any one of the elements is not proven, then Caveators have not met

[122] *In re Will of Cauffiel*, 2009 WL 5247495, at *7 (Del. Ch. Dec. 31, 2009) (quoting *In re Langmeier*, 466 A.2d 386, 403 (Del. Ch. 1983).

[123] *In re West,* 522 A.2d 1256, 1264 (Del. 1987). *See In re Will of Cauffiel*, 2009 WL 5247495, at *7 ("Proving susceptibility involves many of the same issues that are present when challenging testamentary capacity. Establishing this element, however, presents a lower threshold than proving a lack of competency."); *In re Gardner*, 2012 WL 5287948, at *11 (Del. Ch. Oct. 24, 2012); *In re Hammond*, 2012 WL 3877799, at *4 (Del. Ch. Aug. 30, 2012).

[124] *In re West*, 522 A.2d at 1264. No one argued burden-shifting under *In re Melson* in this case. 711 A.2d 783, 788 (Del. 1998) ("[The] presumption of testamentary capacity does not apply and the burden on claims of undue influence shifts to the proponent where the challenger of the will is able to establish, by clear and convincing evidence, the following elements: (a) the will was executed by "a testatrix or testator who was of weakened

21

their burden of proving undue influence.[125]  For purposes of this analysis, I assume, without deciding, that Decedent was a susceptible testator, that Paula had the opportunity to exert undue influence over Decedent, and that Paula had a disposition to unduly influence Decedent for an improper purpose.[126]  And, assuming *arguendo* that undue influence was actually exerted, the resulting disinheritance of Caveators, in favor of Paula, demonstrates its effect.[127]

Thus, "[t]he pivotal issue is whether the evidence is sufficient to establish that [Paula] actually exerted undue influence upon [Decedent]."[128]  Caveators argue that Paula actually exerted undue influence over Decedent because she was his 24/7 caretaker and was the person who contacted the attorneys involved in drafting the Will.[129]  They point to Paula's actions in not telling them about the 2020 Will as

---

intellect"; (b) the will was drafted by a person in a confidential relationship with the testatrix; and (c) the drafter received a substantial benefit under the will.*")* (citations omitted).  The 2020 Will was prepared by an attorney who was not in a confidential relationship with Decedent and did not receive a benefit under the will.

[125] *In re West*, 522 A.2d at 1264.

[126] I make no findings on these points and merely assume that they were proven for purposes of my decision.  Because I hold that the 2020 Will was not the product of undue influence on different grounds, I do not need to engage in these analyses.

[127] Under the 2013 Will, Paula would receive an equal one-fourth share of Decedent's estate with Caveators, while, under the 2020 Will, Paula is Decedent's sole beneficiary.  *See In re Konopka*, 1988 WL 62915, at *5 (Del. Ch. June 17, 1988).

[128] *See id.*

[129] D.I. 87, at 28.  In her testimony, Christine opined that Decedent was susceptible to undue influence because Paula isolated him – she always answered the phone and would be in the room when Christine called Decedent, would not answer the calls or would block their calls, although Christine admitted that Paula shared medical information about

circumstantial evidence that Paula exerted influence upon Decedent in secret.[130] They contend Decedent was under Paula's "complete control" when filling out the estate planning questionnaire for Tomasetti and when she drove him downstate to meet with Tomasetti.[131] Paula responds that Caveators have not satisfied their burden of proof on this element – Decedent expressed his estate plan to two different attorneys, and she was not present during the estate planning meeting with Tomasetti, nor when the Will was signed.[132]

"Delaware law requires the party alleging undue influence to prove its actual exertion by a preponderance of evidence. … [O]pportunity and motive, standing alone, do not establish a charge of undue influence."[133] "The law disfavors invalidating a will absent strong evidence mandating such drastic action. This is especially so where … two equally plausible reasons exist for the late change in beneficiaries."[134] "[T]he evidence must clearly show that undue influence is the

Decedent at times. Trial Tr. 15:4-18; *id.* 28:13-19; *id.* 29:1-11; *id.* 43:1-16. Paula testified that she did block Christine's and Vincent's calls a couple of times when she alleged they bullied her. *Id.* 194:17-195:20.

[130] D.I. 87, at 28-29.

[131] *Id.*, at 29.

[132] D.I. 88, at 9.

[133] *In re West*, 522 A.2d 1256, 1264 (Del. 1987). *See also Sloan v. Segal*, 996 A.2d 794, 2010 WL 2169496, at *7 (Del. 2010) (TABLE). "Actual exertion cannot be satisfied where the action is consistent with the individual's intent." *Ray v. Williams*, 2020 WL 1542028, at *34 (Del. Ch. Mar. 31, 2020) (citation omitted).

[134] *In re West*, 522 A.2d at 1265.

more probable, plausible explanation for the testator's acts, and that, conversely, any alternative explanations are improbable and implausible."[135] "[A]ctual exertion of [undue] influence, rarely is proven with direct evidence because '[p]ersons who unduly influence a testator to change his or her will normally do that surreptitiously.'"[136] So, circumstantial evidence must show that the influencer actually exerted influence over the testator.[137]

"In addition to formulaic efforts to bend the will of a susceptible testator through threats, intimidation, or fear, undue influence also may … appear in the form of one person poisoning the mind of a weak testator by prevailing upon his sense of need and gratitude, coupled with efforts to isolate the testator from other relationships."[138] Where the facts merely show an "attempt[] to influence," the Court will not invalidate a will unless there is some showing of "domination."[139]

The evidence adduced at trial supports two plausible but conflicting conclusions concerning the creation of the 2020 Will. On the one hand, Paula

---

[135] *In re Konopka*, 1988 WL 62915, at *5 (Del. Ch. June 17, 1988).

[136] *In re Dougherty*, 2016 WL 4130812, at *11 (Del. Ch. July 22, 2016) (citation omitted).

[137] *Id.*; *In re Gardner*, 2012 WL 5287948, at *15 (Del. Ch. Oct. 24, 2012); *In re Konopka*, 1988 WL 62915, at *5 ("in most cases proof of undue influence must necessarily be circumstantial, that is, based upon inferences from other objective facts").

[138] *In re Dougherty*, 2016 WL 3410812, at *1.

[139] *In re Kohn*, 1993 WL 193544, at *9 (Del. Ch. May 19, 1993).

engaged in efforts to isolate Decedent from his other children,[140] arranged the meetings with Tomasetti,[141] actively managed the process of executing the Will without advising her siblings,[142] and resented that her siblings weren't helping with Decedent's care.[143] These facts suggest a reasonable conclusion that Paula exerted undue influence in the creation and execution of the 2020 Will.[144]

But, the facts also support another equally – if not more – plausible conclusion that Paula did not exert undue influence upon Decedent. The 2020 Will was prepared by Tomasetti, an experienced Delaware attorney who specializes in wills and estate matters,[145] who testified that he reviewed Decedent's estate plan with him at the June 17, 2020 meeting and again spoke with Decedent about the Will prior to

---

[140] *See* Trial Tr. 14:23-15:18; *id.* 29:1-6; *id.* 43:1-6; *id.* 194:14-195:15. I find, however, that she interacted with Christine about Decedent's medical condition and arranged for Decedent's July 6, 2020 meeting with his family. *Id.* 28:13-19; *id.* 31:20-32:15.

[141] *Id.* 322:24-324:21. Paula also did not advise Tomasetti or anyone in his office about Decedent's medical conditions. *Id.* 325:8-22; *id.* 336:9-21; *id.* 337:15-20.

[142] *Id.* 202:15-18; *id.* 232:8-10; *id.* 271:16-22; *id.* 274:4-10; *id.* 332:3-6; *id.* 354:7-11; *id.* 493:10-14.

[143] *Id.* 499:17-21.

[144] *See In re Dougherty*, 2016 WL 3410812, at *1 (Del. Ch. July 22, 2016); *Sloan v. Segal*, 2009 WL 1204494, at *16-17 (Del. Ch. Apr. 24, 2009). In support of the claim of undue influence, Nina testified that Decedent indicated, while signing the Will, that it was contrary to his wishes. Trial Tr. 100:20-102:6. I do not find Nina's testimony to be credible. Her version of events of the 2020 Will's execution were not corroborated by other testimony, and I consider her demeanor during the testimony, *e.g.*, *id.* 111:4-12, and her volatile relationship with her mother, *e.g.*, *id.* 81:15-16; *id.* 112:6-22; *id.* 114:24-115:3; *id.* 123:10-20.

[145] Trial Tr. 373:8-14.

25

its execution on July 7, 2020.[146] Tomasetti has no recollection of having any conversations with Paula,[147] and Tomasetti purposefully excluded Paula and any other family member from his conversations with Decedent.[148] Overall, Tomasetti's testimony regarding the circumstances of Decedent's estate plan and the 2020 Will's execution reveal his assessment that nothing was out of the ordinary with the 2020 Will, except the conditions imposed by the COVID-19 pandemic.[149] Paula was not present during the Will's execution.[150] Additionally, the record shows that Decedent had changed his estate plan on multiple occasions, affecting the distribution among

---

[146] *See supra* notes 54, 55, 62 and accompanying text.

[147] *See supra* note 57 and accompanying text.

[148] Trial Tr. 375:4-14; *id*. 379:5-8; *id*. 418:2-21.

[149] *Id*. 417:18-423:3; *id*. 424:11-23; *id*. 437:8-22; *id*. 441:4-442:1. I attribute a great degree of weight to Tomasetti's testimony. Because of "the high ethical standards required of [Delaware lawyers]," they have no "motive to ignore or suppress signs that [a testator] was susceptible to [an influencer's] alleged importunities." *In re West*, 522 A.2d 1256, 1264 (Del. 1987). Petitioners impeached Tomasetti's testimony by suggesting that, had Tomasetti known Decedent's medical circumstances, he would have concluded at the time that Paula was exerting influence upon Decedent or that Decedent lacked testamentary capacity. *See* Trial Tr. 408:10-417:17. I do not find this line of testimony persuasive. Tomasetti exercised his judgment as a Delaware attorney when drafting the 2020 Will and overseeing its execution. He was not blind to Decedent's rapid decline over this period, *see id*. 408:12-14, *id*. 424:7-10, but he reasonably concluded that there was nothing that made him question Decedent's competency to sign the 2020 Will, either at the June 17, 2020 initial meeting or on July 7, 2020. One fact that apparently struck Tomasetti was Decedent's feelings of embarrassment over his physical state that affected his ability to sign his name. *Id*. 379:13-18; *id*. 409:19-23; *id*. 422:8-9. Based upon this testimony, Decedent communicated this concern to Tomasetti, and he would have been able to communicate concerns that he had regarding the 2020 Will (if it did not reflect his estate plan), but he did not do so. *See id*. 419:2-4.

[150] Trial Tr. 232:8-24.

the children.[151]  And, Christine, who had been Decedent's caregiver until 2018, left Decedent, moving out of his home, knowing "the repercussions" of this act on her family, while Paula remained to care for him during the last two years of his life.[152] Although the Court does not "probe the substantive propriety" of a testator's testamentary scheme,[153] the evidence shows that it is plausible Decedent established the estate plan reflected in the 2020 Will without the operation of undue influence. I conclude that Caveators have not shown that undue influence is the more probable, plausible explanation for Decedent's acts and, because "two equally plausible reasons exist for the late change in beneficiaries,"[154] Caveators have not met their burden of proving that Paula actually exerted undue influence upon Decedent.  Thus, I recommend that the Court deny Caveators' claim that Decedent's 2020 Will was invalid because it was a product of undue influence.

## C.      Have Caveators Proven their Power of Attorney Claims?

Caveators assert that Paula breached her fiduciary duties as Decedent's agent under a durable power of attorney by failing to provide supporting documentation of expenditures made from Decedent's funds and by using his assets for her personal

---

[151] *See* JX B; JX C; JX D; Trial Tr. 57:22-59:7.

[152] Trial Tr. 52:6-53:6; *id.* 266:3-8.

[153] *In re Porter*, 2007 WL 4644723, at *8 (Del. Ch. Dec. 31, 2007).

[154] *In re West*, 522 A.2d at 1265.  *See also In re Konopka*, 1988 WL 62915, at *5 (Del. Ch. June 17, 1988).

benefit.[155] They demand an accounting and that Paula be surcharged for Decedent's funds she used for her benefit.[156] Paula contends that Caveators have not established a valid reason to demand an accounting – she acknowledges that Decedent provided her with food, shelter and her cell phone in return for her care while she lived with him, claims she used his funds for his medical care and home maintenance, and that Caveators retained access to Decedent's bank account until Decedent's death.[157] It is undisputed that Paula did not provide an accounting to Caveators.[158] The POA appointing Paula as Decedent's agent was executed on July 25, 2019 and was effective immediately.[159] The issue is whether Caveators have shown, by a preponderance of the evidence, that Paula breached her fiduciary duties,[160] and should be made to account for her actions as Decedent's agent under the POA.

---

[155] D.I. 55, ¶¶ 33-37.

[156] *Id.*, ¶¶ 33, 39-40.

[157] D.I. 88, at 10.

[158] Trial Tr. 506:16-18.

[159] There is some question when Paula began managing Decedent's finances. Christine testified that around 2017-2018 Decedent was no longer able to handle his checkbook and Albert and his wife helped him until Paula moved into the Home in March 2018. *Id.* 25:6-26:8; *id.* 25:6-26:15. But she also testified that Albert stopped handling Decedent's finances when he moved away in March 2020. *Id.* 72:11-73:7. Paula testified that she paid Decedent's bills without indicating when she started doing so. *Id.* 504:15-18. Albert remained on Decedent's bank account from prior to March 2018 until Decedent's death. JX K; Trial Tr. 55:10-23.

[160] *See Deputy v. Deputy*, 2020 WL 1018554, at *40 (Del. Ch. Mar. 2, 2020).

28

"Under the DPPAA [Durable Personal Power of Attorney Act], certain persons, including the child of a principal, are authorized to petition the Court of Chancery to impose specified types of relief, including compelling an agent to provide an accounting[] . . . under 12 Del. C. § 49A-114."[161] As agent under a durable power of attorney, Paula owed the duties enumerated in Section 49A-114, which include the duty to act "in the principal's best interest" and the duty of loyalty.[162] Under the DPPAA, an agent has a duty to disclose receipts, disbursements and transactions conducted on behalf of the principal if requested to do so by the principal, a fiduciary of the principal, or a court order.[163] Since Caveators are not the POA's principal or fiduciary and the POA does not instruct Paula to account to them,[164] Caveators have not established that Paula has any duty under the DPPAA to disclose any records or provide an accounting to them.

As Decedent's children, Caveators have standing to seek judicial relief under §49A-116.[165] For the Court to order an accounting as a remedy, Caveators need to prove that Paula breached a fiduciary duty specified under the DPPAA.[166] Although

---

[161] *See Tikiob v. Tikiob-Carlson*, 2021 WL 4310513, at *4 (Del. Ch. Sept. 22, 2021).

[162] 12 *Del. C.* §49A-114.

[163] 12 *Del. C.* §49A-114(g).

[164] *See* JX E.

[165] 12 *Del. C.* §49A-116(b)(2).

[166] *Tikiob*, 2021 WL 4310513, at *4 ("While the DPPAA does not explicitly state what entitles the petitioner to relief under Section 49A-116, I interpret this statute as providing

Caveators contend that Paula breached her fiduciary duties by using Decedent's funds for her personal benefit,[167] they do not identify any of Decedent's funds that were deposited into Paula's personal account, used to pay her car loan or to benefit her personally, other than for food, shelter and her cell phone which Paula testified was provided with his consent (in return for care she gave him).[168] Caveators have not proven, by a preponderance of the evidence, that Paula breached her fiduciary duties under the POA that would warrant ordering her to provide an accounting.[169] Therefore, I recommend that the Court deny Caveators' demand for an accounting and for a surcharge to be imposed against Paula.

### III.  Conclusion

For the reasons set forth above, I recommend that the Court deny the caveat against the allowance of the Last Will and Testament of Albert J. Vietri, Sr., which was executed on July 7, 2020, and admit the 2020 Will to probate.  I also recommend

---

remedies should the petitioner prove a breach of a fiduciary duty specified under the DPPAA.").

[167] D.I. 87, at 34; Trial Tr. 54:23-24; *but see id.* 26:23-27:2 (Christine's testimony that Paula never told her she used Decedent's funds to pay off her car); *id.* 504:15-505:15.

[168] Ex N, 00893.  Caveators point to withdrawals from Decedent's accounts, including a $12,900.00 withdrawal from Decedent's credit line, as monies used for Paula's benefit. *Id.* 503:22-24; *id.* 505:7-10.  Paula responded that any monies that were withdrawn were put into Decedent's checking account and used for "home purposes." *Id.* 505:11-15.

[169] Further, since I have found the 2020 Will is valid, any breaches of Paula's fiduciary duty as agent prior to Decedent's death would affect only her as the sole beneficiary of Decedent's estate.

that the Court deny Caveators' demand for an accounting and for a surcharge against Paula Vietri.  This is a final report and exceptions may be taken under Court of Chancery Rule 144.