# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE LAST WILL )
AND TESTAMENT AND CODICIL OF ANN ) C.A. No. 2022-0803-BWD
C. DUFF, DECEASED. )

## MASTER'S POST-TRIAL FINAL REPORT

Final Report:  June 30, 2023
Date Submitted:  May 10, 2023


Jerry P. Ledwith, Harrington, Delaware; *Petitioner*.

Pamela Houdek, Felton, Delaware; *Respondent*.


**DAVID, M.**

This post-trial final report addresses the validity of a will executed seven days before the death of the testator, Ann C. Duff ("Decedent"). In July 2022, Decedent told her granddaughter and primary caretaker, Pamela Houdek ("Respondent"), that she no longer felt safe in her home. Decedent, who was 89 years old, legally blind, and fighting a decade-long battle with cancer, was hospitalized for ten days. Respondent left town on a previously scheduled trip, and in her absence, Decedent's estranged son, Jerry Ledwith ("Petitioner"), appeared at the hospital to reconcile with his mother. He brought her home, contacted a notary, and two days later, Decedent executed a living will and a durable power of attorney appointing Petitioner and a friend as her agents. Four days after that, Decedent executed a new will appointing Petitioner as executor of her estate and leaving her house to Petitioner. Decedent died one week later. I must now decide whether Decedent had testamentary capacity to execute the new will and if the will was the product of Petitioner's undue influence.

For the reasons that follow, I find that, under the factors set forth in the Delaware Supreme Court's decision in *In re Last Will & Testament of Melson*, 711 A.2d 783 (Del. 1998), Petitioner bears the burden to prove that Decedent possessed testamentary capacity and that the challenged will was not the product of undue influence. I further find that Petitioner has failed to satisfy that burden. I therefore recommend that judgment be entered in favor of Respondent and against Petitioner.

1

## I. BACKGROUND[1]

### A. The Parties and Relevant Non-Parties

In August 2022, Decedent was 89 years old. At trial, Decedent was described as "strong willed,"[2] "difficult,"[3] and sometimes "mean."[4] Decedent had three adult children with whom she had a relationship—Jerry Ledwith ("Petitioner"), Susan Nichols, and Duane Duff—and two other children, one of whom predeceased Decedent and another with whom she did not have a relationship.[5] Decedent's relationship with her children was tumultuous.[6] Decedent "was never really happy with how [her children] acted" and let them know it.[7] Petitioner, who lived next door to Decedent, frequently "butted heads" with her, and testified that Decedent "literally ruined" his other siblings.[8]

---

[1] The facts set forth in this final report reflect my findings based on the record developed at a one-day trial held on May 10, 2023. The trial transcript is cited as "Tr. at __". Petitioner's and Respondent's exhibits are cited as "PX __" and "RX __", respectively.

This report refers to Decedent's family members by their first names for clarity, but no disrespect or familiarity is intended.

[2] Tr. at 189:1.

[3] *Id.* at 86:8-10; 87:21.

[4] *Id.* at 148:18.

[5] *Id*. at 181:8-10.

[6] *Id.* at 88:3-7.

[7] *Id.* at 172:7-12.

[8] *Id.* at 111:12-13; 111:20.

Although Decedent fought with her own children, Decedent's granddaughter (Susan's daughter), Pamela Houdek ("Respondent"), was Decedent's "pride and joy."[9] Decedent helped raise Respondent, who was "the daughter that she wanted."[10] Decedent was proud of her granddaughter, who was married with children,[11] and believed she was "the most stable person . . . in the family that could take care of things."[12]

When Decedent was diagnosed with lung cancer in 2006, Respondent drove her to the University of Pennsylvania to receive cancer treatments.[13] When Decedent's cancer returned in 2018, Respondent continued to take Decedent to her treatments. By 2022, Decedent lived alone and was legally blind. Respondent spoke with Decedent on the phone often,[14] coordinated with her in-home care providers, and drove her to the grocery store and medical appointments.[15] Decedent also listed Respondent as her Life Alert contact to respond in emergencies.[16]

---

[9] Tr. at 147:1-8.

[10] *Id.* at 147:6.

[11] *Id.* at 185:20-186:4.

[12] *Id.* at 170:20-171:2.

[13] *Id.* at 142:13-22.

[14] *Id.* at 187:5-7.

[15] *Id*. at 186:5-11.

[16] *Id.* at 187:8-16.

## B. The 2019 Will

In late 2018, Decedent met with an attorney in Dover to discuss changing her will. Respondent drove Decedent to the appointment and attended the initial meeting.[17] At the meeting, Decedent expressed her wishes that, upon her death, Susan have the option to reside in Decedent's home in Harrington, Delaware (the "House") if Susan could afford to pay the mortgage. If she could not, Decedent wished for the House to be sold, with the proceeds distributed equally among Petitioner, Susan, and Duane.[18]

Respondent testified that the attorney called Decedent a few weeks after their initial meeting and advised that "the way that [Decedent] wanted [the will] worded . . . couldn't [be] put into words because basically it was too many ifs, ands, or buts."[19] But Decedent did not trust that Petitioner, Susan, and Duane would cooperate with one another if she left the House to them in equal shares. To solve that problem, Decedent decided to leave the House to Respondent, whom she trusted

---

[17] Tr. at 181:22-24.

[18] *Id.*

[19] *Id.* at 182:8-11.

to sell it and distribute the proceeds four ways—one quarter to each of Petitioner, Susan, and Duane, and one quarter to Respondent for her assistance with the sale.[20]

On February 20, 2019, Respondent drove Decedent back to the attorney's office and waited in the car while Decedent executed the Last Will and Testament of Ann C. Duff (the "2019 Will").[21] The 2019 Will appointed Respondent as Executrix; left the House to Respondent, her show dog (an Irish setter) to Decedent's friend, Diann Golden,[22] and another dog and cat to Susan; and left the residue of the estate to Petitioner, Susan, and Duane in equal shares.[23]

---

[20] *Id*. at 171:10-14; 181:12-15; 182:8-15. *See also id*. at 146:4-6 ("The house, yes, mom did leave you the house. Because she had told me that she felt that you knew what to do. Like, you wouldn't favor anybody."); *id*. at 161:1-3 ("[T]he only reason that mom did this will with [Respondent] was to avoid all of this."); *id*. at 172:13-17 ("[S]he wanted [Respondent] to make sure . . . that [the children] got stuff equally and to make sure [Respondent] w[as] able to get something for [her]self too for handling it and dealing with this obviously.").

[21] *Id*. at 182:16-22.

[22] Ms. Golden testified that she and Decedent "became good friends because of [their] show dogs, [their] Irish Setters." *Id*. at 22:3-7. Ms. Golden explained that the Irish Setter referenced in the 2019 Will "is long deceased." *Id*. at 48:14-18.

[23] Nothing in the trial record suggests that Decedent lacked capacity to execute the 2019 Will. Susan lived with Decedent from May 2019 through October 2021. Susan testified that during that period, Decedent "was still pretty much good" and "could still do things on her own a little bit." *Id*. at 159:3-5.

### C.    Decedent is Hospitalized.

On July 9 or July 11, 2022, Decedent contacted Life Alert because she was not feeling well.[24]  Respondent met the paramedics at Decedent's home, where Decedent told Respondent that she no longer felt safe in her home.  Decedent was transported to the hospital, where she remained for approximately ten days.

While Decedent was hospitalized, Respondent left town for a few days on a previously scheduled trip.  Petitioner claims that while Respondent was out of town, Decedent's friend, Ms. Golden, called to tell him that Decedent wanted to see him.  According to Petitioner, when he arrived at the hospital, Decedent told him that she had decided to change her will.

At trial, Petitioner presented shifting theories to explain why Decedent suddenly decided to change her will.  First, Petitioner claimed that because Decedent was blind, she was not aware of the contents of the 2019 Will until her friend, Ms. Golden, raised the issue with her.  Ms. Golden testified that while Decedent was in the hospital, she brought to Decedent's attention that, although Decedent wished for Petitioner, Susan, Duane, and Respondent to each receive a quarter of the proceeds from the sale of the House, the 2019 Will left the House only to Respondent.  Petitioner's girlfriend, Stephanie Sharp, testified that Decedent was furious with

---

[24] Tr. at 190:6-9.

Respondent when she discovered that the 2019 Will did not reflect her wishes and decided to make a new will.

Second, Petitioner testified that he learned about the 2019 Will a few months after it was executed, argued with Decedent about it, but decided "the game plan was as long as [Respondent] did what she was supposed to do as a caregiver, [he] had no problem with the will."[25] Petitioner seemed to suggest that Respondent failed as a caregiver by mismanaging Decedent's funds, encouraging Decedent to move into an assisted living facility, and leaving town for a few days while Decedent was in the hospital.[26] All credible evidence presented at trial, however, suggested that Respondent provided excellent care to her grandmother, managed her funds prudently, and left town for just a few days, with her grandmother's blessing.

And third—amazingly—when asked why Decedent decided to change her will, Petitioner admitted that "because of the cancer medications, maybe she wasn't, you know, really firing on all eight cylinders, if you know what I mean."[27] Asked

---

[25] *Id.* at 102:13-15; 103:8-10. *See also id.* at 103:2-3 ("I knew the [2019] [W]ill had been made just after, when we got it, I never tried to change it.").

[26] The parties presented conflicting testimony regarding Decedent's plans for returning home. Respondent testified that Decedent no longer felt safe living at home alone and Respondent supported her decision to transition to an assisted living facility. *Id.* at 190:6-13. Petitioner testified that Respondent intended to place Decedent in a facility against Decedent's wishes and Petitioner vowed he would not let that happen. *Id.* at 31:13-32:2; 110:4-14. *See also id.* at 80:1-10.

[27] *Id.* at 132:17-20.

again why Decedent changed her will, Petitioner testified, "[s]he was undergoing cancer treatments, and she was on a lot of medication."[28] Petitioner also claimed that Respondent is "now all bent out of shape because I did exactly to her what she did to me."[29]

### D. The 2022 Will

Decedent was discharged from the hospital on July 21, 2022, into Petitioner's care. Neither party presented medical testimony describing Decedent's condition at that time. Petitioner testified that Decedent "was in fine shape,"[30] and Stephanie testified that when Decedent left the hospital it had "[a]lready been cleared that she was of sound mind,"[31] claiming a social worker told Decedent, "once you're released here tomorrow, you're of sound mind, and you can change your will 50 times if you want."[32] Yet, Petitioner also admitted that Decedent "had one hell of a cocktail" of medications and was not "firing on all eight cylinders."[33]

---

[28] *Id.* at 133:10-11.

[29] *Id.* at 87:9-11.

[30] Tr. at 110:20-21.

[31] *Id.* at 85:2-6.

[32] *Id.* at 80:22-24.

[33] *Id.* at 132:17-20; 135:17-21.

On their way home from the hospital, Petitioner took Decedent to the bank to remove Respondent as a signer on her account.[34] Meanwhile, Respondent, who had returned from her trip, cleaned Decedent's house and was present to assist with moving furniture when Decedent arrived home with Petitioner.

The next day, Stephanie contacted Delaware Mobile Signing Notary ("DMSN").[35] Stephanie testified that even though "[y]ou can get a new will the day before you pass away," "we thought [using DMSN] protected us."[36] The day after that, on July 23, 2022, Decedent executed a Living Will appointing Petitioner and Ms. Golden as Decedent's health care agents, and a Durable Power of Attorney appointing Petitioner and Ms. Golden as Decedent's agents.[37] Marcia Boyer, the owner of DMSN, testified that "with every customer, when we're doing a will or power of attorney, we do a general competency with every person to make sure that they understand the type of document that they're signing," and "there was no inclination that [Decedent] did not understand what she was signing."[38]

---

[34] *Id.* at 110:21-111:3.

[35] *Id.* at 8:24-9:1.

[36] *Id.* at 99:20-100:7.

[37] *Id.* at 89:11-16; PX E.

[38] Tr. at 10:6-14.

While Ms. Boyer was at Decedent's home, Petitioner asked whether DMSN also prepared wills.[39] Ms. Boyer confirmed that they did.[40] Sometime between July 23 and July 27, DMSN held a Zoom meeting with Decedent to discuss the contents of her new will. A paralegal employed by DMSN, Gwendolyn Green-Surman, testified that she "wrote everything down that [Decedent] said" during the Zoom meeting and then "typed up" the will.[41] While Ms. Green-Surman testified that Decedent spoke on the call and no one else was on camera,[42] Petitioner and Stephanie both admitted that they were present during the Zoom meeting off camera.[43]

Based on the direction provided at the Zoom meeting, Ms. Green-Surman prepared a new will for Decedent using a will template (the "2022 Will"). On July 27, 2022, DMSN returned to Decedent's home with the 2022 Will. Ms. Boyer testified that, again, she asked basic questions of Decedent to assess her capacity to make a will. The 2022 Will was signed by Decedent using "guided assistance"

---

[39] *Id.* at 55:1-8.

[40] *Id.* at 9:16-21.

[41] *Id.* at 55:15-18.

[42] *Id.* at 66:5-19.

[43] *Id.* at 101:7-14; 135:6-8. Stephanie testified that she connected Decedent to the Zoom call using her (Stephanie's) phone.

(meaning a pen was placed in her hand and her hand was placed on the paper[44]), initialed by Petitioner purportedly at Decedent's direction, witnessed by Stephanie and Ms. Golden, and notarized by Ms. Boyer.

The 2022 Will appoints Petitioner as Personal Representative of Decedent's estate; leaves the House to Petitioner, but separately states that "Susan Nichols and or Duane Duff that if they are financially able to afford the house payments they are welcome to stay in the home";  states that Petitioner, Susan, and Duane are to receive "whatever in reason" as "special bequests"; and separately directs that "all of [Decedent's] personal property that has not been bequeathed as special bequests or as part of my Estate be 1/3 to each of the listed children, Jerry Ledwith, Susan Nichols, Duane Duff."[45]

The 2022 Will contains pages with large blanks and omits Sections 7, 8, and 9, but Ms. Green-Surman testified that the blanks and missing sections were intentional and that the document had not been altered.[46]  The 2022 Will does not state that the document was read aloud due to Decedent being legally blind.  While Ms. Green-Surman testified that she read the 2022 Will "word for word" to

---

[44] *Id*. at 19:13-20.

[45] PX L, Copy C §§ 2, 4-6, 17.  The 2022 Will also contains a "Pet Directive" clause stating that "I would like to elect Diann Golden . . . to act as the caretaker of the following animal(s)," but no pets are identified. *Id*. § 11.

[46] Tr. at 68:17-69:3.

Decedent,[47] Ms. Boyer testified that only "important sections where it require[d] [Decedent] to sign" were read aloud.[48]

Decedent passed away on August 3, 2022, seven days after the 2022 Will was signed.[49]

### E.    Procedural History

After Decedent's passing, Respondent presented the 2019 Will, and Petitioner presented the 2022 Will, to the Register of Wills for Kent County. On August 19, 2022, the Register of Wills sent Petitioner a letter advising him that the 2022 Will was "found to be deficient."[50] The letter explained that "[t]he nature of the [2022] Will, including differing types of paper, inconsistent provisions as to bequests and distribution, and the appearance of third-party handwriting other than the Testatrix's without notation or reference that the same was made at her direction and instruction upon her personal review and reading of the Will, prevents our office from declaring the instrument as self-proving in accordance with 12 *Del. C.* § 1305."[51] The letter

---

[47] *Id.* at 55:19-56:1.

[48] *Id.* at 18:20-24.

[49] At trial, the parties testified at length about Decedent's funeral arrangements. Because that testimony does not bear on the legal issues presented, I do not summarize it here.

[50] PX B.

[51] *Id.*

further advised Petitioner that, "per your affirmative representation, you are a convicted felon and thus disqualified from serving as Executor."[52]

On September 12, 2022, Petitioner filed a Petition for Review of Proof of Will (the "Petition") in this Court. On November 28, 2022, Respondent answered the Petition. A one-day trial took place on May 10, 2023.

## II.    ANALYSIS

Petitioner seeks an order admitting the 2022 Will to probate. Respondent seeks an order admitting the 2019 Will to probate on the grounds that Decedent lacked testamentary capacity to execute the 2022 Will and the 2022 Will was the product of undue influence.

### A.    Burden of Proof

"Under Delaware law, all . . . will-contest matters start with the presumption that a testator had the capacity to make a will at the time it was made." *Matter of Langmeier*, 466 A.2d 386, 389 (Del. Ch. 1983). "[T]he party attacking testamentary capacity . . . bears the burden of establishing that the decedent was legally incapable of executing a valid will." *In re Last Will & Testament of Melson*, 711 A.2d 783, 786 (Del. 1998). "[T]he challenger [also] carries the burden of proving that the will was a product of undue influence." *Id.* However,

---

[52] *Id.*

13

the presumption of testamentary capacity does not apply and the burden on claims of undue influence shifts to the proponent where the challenger of the will is able to establish, by clear and convincing evidence, the following elements: (a) the will was executed by "a testatrix or testator who was of weakened intellect"; (b) the will was drafted by a person in a confidential relationship with the testatrix; and (c) the drafter received a substantial benefit under the will.

*Id.* at 788.

Accordingly, Decedent will be presumed to have had the capacity to make the 2022 Will unless Respondent establishes, by clear and convincing evidence, that all three *Melson* factors are satisfied. If she satisfies that burden, then Petitioner bears the burden to prove, by a preponderance of the evidence, that Decedent possessed testamentary capacity and that the 2022 Will was not the product of undue influence.

### 1. Was Decedent of "Weakened Intellect" When She Signed the 2022 Will?

"Although a precise standard for 'weakened intellect' has not been articulated in our law, it has been recognized that the party challenging a will need not demonstrate an advanced degree of debilitation." *Sloan v. Segal*, 2009 WL 1204494, at *13 (Del. Ch. Apr. 24, 2009). "[T]he court need not find that someone lacked testamentary capacity to find that she was suffering from a weakened intellect." *Id.* Rather, assessment of weakened intellect "is a fact-intensive inquiry, and the Court considers all circumstances, including whether the individual was suffering from a debilitating mental condition and whether objective evidence indicates that the

14

individual could comprehend, understand, and make decisions [her]self." *Ray v. Williams*, 2020 WL 1542028, at \*30 (Del. Ch. Mar. 31, 2020).

Weighing the evidence, I find that Respondent has proven by clear and convincing evidence that Decedent was of weakened intellect when she signed the 2022 Will. Decedent was 89 years old, legally blind, required in-home medical care, and relied on Respondent's assistance to manage her medical care and finances. After battling cancer for many years, Decedent told Respondent that she no longer felt safe in her home and was hospitalized. By Petitioner's own admission, Decedent "had one hell of a cocktail" of medications and was not "firing on all eight cylinders."[53] And, sadly, Decedent died just seven days after the 2022 Will was signed. Respondent has met her burden to demonstrate by clear and convincing evidence that Decedent was of weakened intellect when she executed the 2022 Will.

### 2. Was the 2022 Will Drafted by a Person in a Confidential Relationship With Decedent?

I next consider whether the 2022 Will was drafted by a person in a confidential relationship with Decedent.

First, I find that, although DMSN prepared the document, Petitioner must be deemed the "drafter" of the 2022 Will. As the Delaware Supreme Court explained in *Melson*, when an individual other than the testator dictates the terms of a will

---

[53] Tr. at 132:17-20.

without the assistance of attorneys, there are no ethical safeguards to protect the interests of the testator, necessitating a burden shift:

> [A]n attorney drafting a will should, where circumstances permit, make a preliminary determination of competency through personal contact with the testatrix before the drafting process. Most important, where an attorney acts as the drafter of the will, the attorney is ethically forbidden from sharing under it. We are thus satisfied that, where the drafter of the will is a lawyer acting in a lawyer-client relationship, sufficient safeguards exist to permit the application of the usual presumptions and burden of proof. ***We confront here, however, a situation that lacks implicit ethical safeguards and presents a paradigm for placing the burden of persuasion on the drafter/beneficiary***. ***The will was drafted by a person without legal training under no ethical constraints concerning the limitation on his conduct***.

*Melson*, 711 A.2d at 787 (citations omitted) (emphasis added). That is true whether the drafter inputs information "using a software package designed for laypersons to prepare their own wills,"[54] as in *Melson*, or if, like the Petitioner here, he dictates the terms to a non-lawyer notary or paralegal using a template to prepare the will.

Stephanie testified that she contacted DMSN to "protect[]" Petitioner.[55] Ms. Green-Surman, who is not a lawyer, prepared the 2022 Will by filling out a form designed for laypersons using information that was provided to her by Petitioner and his girlfriend. While Ms. Green-Surman claims it was Decedent who provided

---

[54] *Melson*, 711 A.2d at 784.

[55] Tr. at 99:20-100:7.

direction to her during the Zoom meeting, I do not find that testimony credible. For one, while Ms. Green-Surman testified that only Decedent spoke on the call, Petitioner and Stephanie both admitted that they were present, and while Ms. Green-Surman testified that she read the 2022 Will "word for word" to Decedent, Ms. Boyer testified that only some sections were read aloud. Ms. Green-Surman also admitted that since this litigation was initiated, DMSN has been engaged by Petitioner to assist with filings in this litigation.[56] That, in combination with Plaintiff's other admissions—including that Petitioner "did exactly to [Respondent] what she did to [him]"[57]—convinces me that the terms of the 2022 Will were dictated by Petitioner, without any ethical safeguards to protect Decedent.

Respondent likewise met her burden to demonstrate by clear and convincing evidence that Petitioner was in a "confidential relationship" with Decedent when he caused the 2022 Will to be drafted. "A confidential relationship exists where 'circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed.'" *In re Purported Last Will & Testament of Wiltbank*, 2005 WL 2810725, at *6 (Del. Ch. Oct. 18, 2005), *judgment entered sub nom. In re Wiltbank*

---

[56] *Id*. at 73:5-21; 74:21-75:6.

[57] *Id*. at 87:9-11.

(Del. Ch. 2005); *see also In re Last Will of Szewzcyk*, 2001 WL 456448, at \*5 (Del. Ch. Apr. 26, 2001) (same).

In *In re Wilbank*[58] and *In re Szewzcyk*,[59] the Court found a confidential relationship existed under circumstances very similar to those presented here. In each case, the Court found that at the time the disputed will was created, the decedent's relationship with other family members was "strained," and the individual who influenced the decedent to make the will had been granted a power of attorney to act for the decedent. Similarly, here, Decedent's relationship with her children was tumultuous and, according to Petitioner, Decedent was even angry with Respondent, with whom she had always been close. Further, at the time the 2022 Will was signed, Petitioner was appointed as Decedent's agent pursuant to a Living Will and a Durable Power of Attorney. That the Living Will and Durable Power of Attorney were signed just four days before the 2022 Will "is immaterial, because what is relevant is the confidentiality of the relationship *at the time of the execution of the will*." *Szewzcyk*, 2001 WL 456448, at \*5 (emphasis in original).

---

[58] 2005 WL 2810725, at \*6.

[59] 2001 WL 456448, at \*5.

18

Accordingly, I conclude that the second *Melson* factor—that Petitioner, as drafter of the Will, was in a confidential relationship with Decedent—was established at trial by clear and convincing evidence.

### 3. Did Petitioner Receive a Substantial Benefit Under the 2022 Will?

Respondent also established by clear and convincing evidence that Petitioner received a substantial benefit under the 2022 Will. The 2022 Will provides that Petitioner, instead of Respondent, would receive the House. The third *Melson* factor is satisfied.

### B. The 2022 Will Should be Set Aside as the Product of Undue Influence.

Because Respondent satisfied her burden to prove, by clear and convincing evidence, that each of the three *Melson* factors is met, the burden shifts to Petitioner to prove, by a preponderance of the evidence, that Decedent had testamentary capacity at the time she signed the 2022 Will and that the 2022 Will was not the product of undue influence. *Melson*, 711 A.2d at 788.

"[O]nly a modest level of competence is required for an individual to possess the testamentary capacity to execute a will." *In re Est. of W.*, 522 A.2d 1256, 1263 (Del. 1987). "[T]he standard is that one who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what he or she is doing and how he or she is disposing of his or her property." *Id.*

19

"The person must also possess sufficient memory and understanding to comprehend the nature and character of the act." *Id.*

Neither party presented medical testimony regarding Decedent's condition at the time she made the 2022 Will. Instead, the only evidence presented to prove Decedent's testamentary capacity was the self-serving testimony of Petitioner, Petitioner's girlfriend, and two employees of DMSN, who have since served as Petitioner's paralegals to assist with filings in this litigation. Decedent was 89 years old, battled cancer for years, required in-home medical assistance, and died seven days after the 2022 Will was executed. By Petitioner's admission, Decedent "had one hell of a cocktail" of cancer medications[60] and was not "firing on all eight cylinders."[61]

Assuming, without deciding, that Petitioner satisfied his burden to prove by a preponderance of the evidence that Decedent had testamentary capacity to make the 2022 Will, I find that the 2022 Will should be set aside as the product of undue influence.

As explained above, where the three *Melson* factors are established by clear and convincing evidence, the burden "shifts to the proponent of the will . . . to show

---

[60] Tr. at 135:17-21.

[61] *Id.* at 132:17-20.

the absence of undue influence." *Melson*, 711 A.2d at 788. "That is, [he] must demonstrate the negative of the elements of an undue influence claim: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect." *In re Est. of Hafer*, 2000 WL 1721124, at *4 (Del. Ch. Sept. 8, 2000), *aff'd*, 2000 WL 1721129 (Del. Ch. Oct. 25, 2000).

Petitioner failed to satisfy that burden here. I have already found that Decedent was of weakened intellect "and thus was a susceptible testator." *Hafer*, 2000 WL 1721124, at *4.

Petitioner had the opportunity to influence Decedent. On July 9 or 11, 2022, Decedent contacted Life Alert and expressed to Respondent that she did not feel safe in her home. She was hospitalized, and Respondent, the family member primarily responsible for her care, left town for just a few days. While Respondent was gone, Petitioner, who had not been on speaking terms with Decedent, visited her in the hospital and vowed to keep her out of an assisted living facility. In the two weeks between discharge from the hospital and her death, Decedent was entirely dependent on Petitioner.

Further, focusing solely on the execution of the 2022 Will, Petitioner had the opportunity to influence Decedent because she could not read the document. Indeed, while Ms. Green-Surman testified that she read the 2022 Will "word for word" to

21

Decedent, Ms. Boyer testified that only "important sections where it require[d] Decedent to sign" were read aloud.[62]  Under these circumstances, Petitioner has failed to demonstrate that he did not have the opportunity to exert influence over Decedent's testamentary disposition.

Petitioner also failed to demonstrate that he lacked the disposition to exert his influence for an improper purpose.  Ostensibly, he admitted to acting with an improper purpose by testifying that he "did exactly to [Respondent] what she did to [him]."[63]  And finally, Petitioner failed to demonstrate that he did not actually exert influence over Decedent.  Rather, the trial record shows that Petitioner took Decedent to the bank to remove Respondent as a signer on her accounts before she even got home from the hospital.  The next day, Petitioner's girlfriend contacted the notary service, which she thought would "protect[]" them, to coordinate execution of the Living Will and Durable Power of Attorney, through which Decedent appointed Petitioner as her agent.  Petitioner and his girlfriend coordinated and attended the Zoom meeting with DMSN to discuss the contents of Decedent's new will.  They then coordinated the signing and notarization of the 2022 Will, during which Petitioner himself signed Decedent's initials on the document.

---

[62] Tr. at 55:19-56:1; 18:20-24.

[63] *Id.* at 87:9-11.

For these reasons, I find, based on the evidence presented at trial, that Petitioner has failed to satisfy his burden to demonstrate that the 2022 Will was not the product of undue influence.[64]

## III. CONCLUSION

For the reasons explained above, I conclude that the 2022 Will should be set aside as the product of undue influence. Accordingly, I recommend that judgment be entered in favor of Respondent and against Petitioner. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144. Any stay of exceptions to interlocutory orders is hereby lifted.

---

[64] In fact, I find the evidence presented at trial so supportive of a finding of undue influence that even if Respondent bore the burden to demonstrate by clear and convincing evidence that the 2022 Will was the product of undue influence, it would be satisfied.